ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A Professional Corporation
Ronald W. Novotny, SBN. 100041, Rnovotny@aalrr.com
Robert R. Roginson, SBN 185286, Rroginson@aalrr.com
Paul G. Szumiak, SBN 109982, Pszumiak@aalrr.com
12800 Center Court Drive South, Suite 300
Cerritos, California 90703-9364
Telephone: (562) 653-3200
Fax: (562) 653-3333

Attorneys for Plaintiff Clean Truck Coalition, LLC and
Member Motor Carriers

FILED
CLERK, U.S. DISTRICT COURT

OCT 17 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV 12 8949 MMM (AJWx)

| | |
|---|---|
| CLEAN TRUCK COALITION, LLC; a California Limited Liability Company; GREEN FLEET SYSTEMS, LLC; a Delaware limited liability company; OVERSEAS FREIGHT, INC. a California corporation; PACIFIC 9 TRANSPORTATION, INC. a California corporation; SOUTHERN COUNTIES EXPRESS, INC., a California corporation; and TOTAL TRANSPORTATION SERVICES, INC., a California corporation, | Case No. |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE JUDGMENT** |

Plaintiffs,

v.

JULIE SU, LABOR COMMISSIONER OF THE STATE OF CALIFORNIA, DEPARTMENT OF INDUSTRIAL RELATIONS, in her official capacity, and PAM HARRIS, DIRECTOR OF THE CALIFORNIA EMPLOYMENT DEVELOPMENT DEPARTMENT, in her official capacity,

Defendants.

NOW COME PLAINTIFFS FOR THEIR COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF HEREIN ALLEGE AS FOLLOWS:

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred on this Court by virtue of 28 U.S.C. §§ 1331 and 1337, based on the federal question as to whether 49 U.S.C. § 14302(f) exempts Plaintiff Clean Truck Coalition and its members, including but not limited to Plaintiff motor carriers, from application of the state laws administered by Defendants as alleged herein. Plaintiffs seek a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.* and Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. §§ 10101, *et seq.*, that Plaintiff CTC's members, including but not limited to the Plaintiff motor carriers are exempt from the application of said state laws because the application and enforcement of such laws by Defendants will prevent the pooling arrangement approved by the federal Surface Transportation Board, a division of the United States Department of Transportation, from being implemented, as well as injunctive relief pursuant to Federal Rule of Civil Procedure 65 prohibiting Defendants from applying those laws prospectively against the operations of Plaintiff's members.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the pooling agreement was entered into and carried out within the geographical boundaries of the United States District Court for the Central District of California, and a substantial amount of the alleged events occurred in this judicial district.

3.      The Clean Truck Coalition.   Plaintiff Clean Truck Coalition, LLC ("CTC") is a California limited liability company comprised of a group of ten (10) motor carriers (the "CTC Members" or "CTC Motor Carriers") which lease truck tractors, including clean trucks, and trailers to independent motor carrier contractors that deliver goods to and from the Ports of Los Angeles and Long Beach, California.

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

014078.00008
16707473.1

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

1  CTC's Members routinely coordinate and arrange for the pick-up and delivery of

2  freight at the two Ports in interstate commerce pursuant to operating authorities

3  issued by the U.S. Department of Transportation ("DOT").   In accordance with

4  federal law, Plaintiff's members have entered into a "pooling agreement" which was

5  approved by the federal Surface Transportation Board ("STB"), which permits them

6  to lawfully combine to share trucks, other equipment, and services between them,

7  including contracts with entrepreneur independent drivers, for the purpose of

8  complying with a "Clean Truck Program" adopted at the Ports without running afoul

9  of the antitrust laws or other "state laws" which would otherwise possibly prevent

10  such collaborative agreements from being carried out.

11      4.   The CTC Members.  As a limited liability company, CTC is owned by

12  its members, which are the following entities: Plaintiff **Green Fleet Systems, LLC,**

13  a Delaware limited liability company having its principal place of business in the

14  State of California; **California Intermodal Associations, Inc.,** a California

15  corporation having its principal place of business in the State of California; **Fox**

16  **Transportation, Inc.,** a California corporation having its principal place of business

17  in the State of California; **Golden State Express, Inc.,** a California corporation

18  having its principal place of business in the State of California; **Harbor Division,**

19  **Inc.,** a California corporation having its principal place of business in the State of

20  California; Plaintiff **Overseas Freight, Inc.,** a California corporation having its

21  principal place of business in the State of California; Plaintiff **Pacific 9**

22  **Transportation, Inc.,** a California corporation having its principal place of business

23  in the State of California; **Progressive Transportation Services, Inc.,** a California

24  corporation having its principal place of business in the State of California; Plaintiff

25  **Southern Counties Express, Inc.,** a California corporation having its principal

26  place of business in the State of California; and, Plaintiff **Total Transportation**

27  **Services, Inc.,** a California corporation having its principal place of business in the

28  State of California.  Each of these **CTC Motor Carriers** provide and operate

014078.00008
10707473.1

transportation services through duly authorized and valid motor contract carrier permits issued by the Federal Motor Carrier Safety Administrator ("FMCSA"), a division by the U.S. Department of Transportation ("DOT"). **Plaintiffs Green Fleet Systems, LLC, Intermodal Associations, Inc., Overseas Freight, Inc., Pacific 9 Transportation, Inc., and Total Transportation Services, Inc.,** and each of them, have been subjected to the investigations and adjudicatory proceedings by the Defendants which are complained of herein. All of the operations by CTC Members to and from the Ports of Los Angeles and Long Beach are in the nature of interstate freight.

5. The Labor Commissioner. Defendant Julie Su is the Labor Commissioner of the California Department of Industrial Relations, which is a member department of the California Labor and Workforce Development Agency ("LWDA"). The Office of the Labor Commissioner (also known as the State "Division of Labor Standards Enforcement," or "DLSE") was established, among other things, to adjudicate wage claims under the California Labor Code.

6. The Employment Development Department. Defendant Pam Harris is the Director of the California Employment Development Department ("EDD"), another member department of the California LWDA. The EDD is responsible for, among other things, assessing and collecting payroll taxes from employers for work performed by their employees in California.

## FACTS

7. Throughout the course of their operations as motor carriers engaged in the interstate transportation industry in Southern California, the CTC Members have routinely leased tractors, trailers, and other trucking equipment from independent motor carrier contractors ("independent motor carrier contractors") who transport shipments on behalf of the CTC Members to and from the two Ports under separate lease agreements which are standard in the industry. The CTC Motor Carriers' relationships with independent motor carrier contractors are memorialized in

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

014078.00908
30707473.1

individual and secular forms of Vehicle Lease Agreements, Freight Hauling Agreements, and other similar agreements, confirming the independent motor carrier contractors' status as independent contractors who are responsible for their own taxes, insurance, licenses, employees, and other requirements necessary to transport freight by truck in California under lease with any one of the CTC Motor Carriers. Pursuant to these Agreements, the independent motor carrier contractors are also responsible for their own business expenses, including maintenance, repair, parking and fuel expenses, and are compensated for freight hauling in accordance with negotiated rates and not by the payment of wages. These independent motor carrier contractors regularly enter into independent contractor agreements providing for the performance of transportation services for the CTC Motor Carriers on a non-exclusive basis, and are not treated by CTC's Motor Carriers as employees for any purpose, including payroll tax withholding, and accordingly, are not subject to California's labor laws relating to employees.

8. Beginning in 2008, the Board of Harbor Commissioners of the City of Los Angeles and the Port of Long Beach adopted a "Clean Trucks Program" which was designed to replace pollution-causing trucks with newer ones that would emit fewer particulates. The Clean Truck Program was made part of a Concession Agreement whereby "clean trucks" were required to be used by motor carriers hauling freight to and from the Ports by 2012, and was aimed at reducing air pollution. In devising the Clean Truck Program, the Ports recognized that the vast majority of port drayage was hauled by independent motor carrier contractors under lease agreements with licensed motor carriers such as the CTC Members, and implemented an incentive program providing operators with the opportunity to obtain access to and possible ownership of newer, lower-emission "clean trucks" through a Truck Funding Program.

9. The CTC Members individually and as a group have made a significant investment in clean trucks through the purchase of over six hundred "clean trucks"

014078.00008
10707473.1

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

1  in order to be able to continue doing business at the Ports pursuant to the

2  requirements of the Concession Agreements. CTC's ten current members have been

3  selected and qualified as concessionaires for purposes of participating in the Clean

4  Trucks Program.  However, because the carriers' needs for the trucks vary

5  depending on the amount of shipments they may have to deliver to or pick up from

6  the Ports at any given time, and in accordance with 49 U.S.C. § 14302, CTC's

7  Members agreed to enter into and seek approval by the Surface Transportation

8  Board ("STB"), a legislative sub-agency within the U.S. DOT, of a collective

9  "pooling arrangement" whereby the CTC Members would be able to utilize each

10  other's clean truck equipment, subject to independent motor carrier contractor leases

11  when and if service requirements necessitated access to additional vehicles to meet

12  customer demands.

13       10.    Pooling agreements are authorized under 49 U.S.C. Section 14302.

14  That statute provides:

15            (b)    **Standards for approval.**--The   [Surface
            Transportation] Board may approve and authorize an
16            agreement or combination between or among motor
            carriers of passengers, or between a motor    carrier of
17            passengers and a    rail carrier of passengers if the carriers
            involved assent to the pooling or division and the Board
18            finds that a pooling or division of traffic, services, or
            earnings--
19
20
21            (1) will be in the interest of better service to the public or
22            of economy of operation; and

23            (2) will not unreasonably restrain competition.

24            . . . and,

25
26            (f) **Effect of approval.**--A carrier may participate in an
            arrangement approved by or exempted by the Board under
27            this section without the approval of any other Federal,
            State, or municipal body. <u>A carrier participating in an</u>
28            <u>approved or exempted arrangement is exempt from the</u>

AIKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

014078.00008
10707473.1

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

<u>antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the arrangement.</u> (Emphasis added.)

11.    The pooling agreement was entered into by the CTC Members in the form of the Operating Agreement between CTC and all CTC Members which the STB recognized to be the pooling agreement between them for purpose of 49 U.S.C. § 14302 in anticipation that their joint efforts would facilitate the most efficient allocation and utilization of their specialized clean truck equipment between them with the intention of promoting better operating efficiency and operation of the vehicles without the need to add new equipment, thereby economically enhancing the goals and purposes of the Ports of Los Angeles and Long Beach and reducing the health risks to the local population and the environment.    As part of the agreement, the CTC Members joined together to create a clean truck vehicle clearinghouse between and amongst each of them through the CTC entity and their respective ownership interests in it, to monitor available trucks so that any given CTC Member may have access to such equipment when its own fleet is otherwise committed to existing shipments.    A true and correct copy of the CTC Operating Agreement is attached hereto as Exhibit 1.

12.    Application for approval of the Section 14302 pooling arrangement by the STB, a federal agency established under the Interstate Commerce Act, was made by CTC on June 3, 2009 pursuant 49 U.S.C. § 14302 and 49 CFR Part 1184.  One of the principal reasons the CTC Members entered into the pooling agreement was to enable them to jointly have access to and utilize independent motor carrier contractors who have performed services for other CTC Members to drive "clean trucks" to and from the Ports in leased vehicles as independent motor carrier contractors, without the need to be concerned about whether such drivers would be considered the employees of any given member.  As part of the application, CTC stated that its members had used and would continue to use independent motor

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

1    carrier contractors to haul freight to and from the Ports, and that it would consider

2    adding qualified carriers to the agreement in the future as permitted by the Board. A

3    true and correct copy of the CTC Application to the STB is attached hereto as

4    Exhibit 2.

5         13.    On November 19, 2009, the STB unanimously approved CTC's

6    pooling arrangement pursuant to 49 U.S.C. § 14302. In its decision, the STB

7    determined that by entering into the pooling arrangement, the CTC Members would

8    have "continuous access to an inventory of clean trucks and would be able to

9    monitor the availability of clean trucks." The Board specifically concluded that the

10   pooling agreement served the public interest by enabling the members to "form a

11   coordinated network of information to track clean trucks," to "coordinate internal

12   invoicing on leases between members," and to "jointly purchase equipment and

13   materials on a group basis." A true and correct copy of the STB's Decision is

14   attached hereto as Exhibit 3.

15        14.    Following and notwithstanding STB approval of the Pooling

16   Arrangement, Defendants commenced a purported "investigation" into certain of the

17   CTC Members' operation for the ostensible purpose of determining whether or not

18   the independent motor carrier contractors with whom each contracts to haul freight

19   under the pooling arrangement should be reclassified and treated as employees

20   under California law, thereby undermining the leasing arrangements of each CTC

21   Member to the extreme detriment of their respective transportation services,

22   contrary to the specific exemption under Section 14302. The investigations have

23   taken the form of audits conducted by the EDD to determine the status of the

24   independent motor carrier contractors as employees or independent contractors as

25   the targeted CTC Motor Carriers for payroll tax withholding purposes, and of

26   investigations by the Labor Commissioner into the carriers' operations for the

27   purpose of finding that the independent motor carrier contractors should be

28   considered employees under California law who are entitled to overtime pay, meal

1   and rest breaks, "waiting time" pay, or reimbursed business expenses.  With respect

2   to claims for unreimbursed business expenses, the Defendant Labor Commissioner

3   is processing claims on behalf of independent motor carrier contractors for

4   reimbursement of expenses which said independent motor carrier contractors

5   expressly agreed to incur as part of their lease agreements and which, if the CTC

6   Members were required to pay them, would result in windfall payments far in excess

7   of the negotiated drayage rates that said independent motor carrier contractors

8   agreed to with the carriers and which the carriers took into account in forming the

9   pooling agreement.  These drayage rates were calculated based upon the assumption

10  that the independent motor carrier contractors would be paying their own business

11  expenses.  Pay rates for employee drivers in the trucking industry are calculated in a

12  completely different manner than rates that are typically agreed to between motor

13  carriers and independent motor carrier contractors. If the CTC Members are required

14  to compensate said independent motor carrier contractors for such damages resulting

15  from any "employee" findings would therefore impede, impair, and prevent them

16  from being able to carry out the pooling agreement, since the CTC Members would

17  incur overhead costs in much higher amounts than were originally contemplated.

18  Defendants' audits and investigations are continuing and will continue unless

19  enjoined by this Court in a concerted effort to undermine Plaintiff CTC Members'

20  contractual relationship with the independent motor carrier contractors, contrary to

21  the very shared equipment lease model that served as the basis for the STB's

22  approval in its unanimous decision authorizing the pooling arrangement of and by

23  the CTC Members, all of whom rely on such arrangements as an aspect of their own

24  transportation businesses.    These  audits,  investigations,  and  adjudicatory

25  proceedings are directly interfering with and will prevent the pooling arrangement

26  approved by the STB from being undertaken unless halted under the preemption

27  mandate of 49 U.S.C. § 14302.

28

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

014078.00008
[0707473.1]

15.    Both of the Defendants have adopted an unwritten policy of determining that independent motor carrier contractors who lease their trucks from carriers, such as the independent motor carrier contractors which have traditionally hauled freight pursuant to contracts with CTC Members, are automatically considered employees of the carriers without considering any of the other relevant criteria that is necessary to establish that an independent contractor motor carrier is an employee as opposed to an independent contractor under applicable law, whereas under both federal and California law, the determination of whether a worker is an employee or independent contractor is a multi-factor analysis and no one factor is legally dispositive of the issue.  This policy has been applied uniformly in the past to other carriers which have contracted independent motor carrier contractors to haul freight to the Ports, and will be applied to CTC Members unless enjoined by this Court.  Upon commencement of any inquiry into the legal status of any of the independent motor carrier contractors contracted by CTC Members, Deputy Labor Commissioners and EDD representatives assigned to handle the investigation, claim or inquiry are instructed as a matter of policy by both of the Defendants to find such independent motor carrier contractors to be employees, after proceeding to hearing or otherwise, based solely on the fact that they lease a vehicle from one of CTC Motor Carriers.  The application of this policy will also interfere with the pooling agreement approved by the STB and will prevent it from being carried out within the meaning of the statute, because the agreement was founded on the expectation that CTC Members would be able to utilize each independent motor carrier contractor and the equipment leased to it by the CTC Members on an as-needed basis pursuant to independent contractor motor carrier relationships between CTC Members and the independent motor carrier contractors who lease vehicles to the Plaintiffs in the normal course of business.

16.    The Defendants' ongoing investigations into the CTC Members' operations and practices, and the enforcement policies of the Defendants which

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

1   require independent motor carrier contractors who lease trucks to CTC Members be

2   treated as employees instead of independent contractors, are "state laws" which

3   CTC Members may be exempted from complying with if such exemption is found

4   necessary to enable CTC Members carry out the pooling arrangement within the

5   meaning of 49 U.S.C. § 14302(f).  By this Complaint, Plaintiffs seek a declaration to

6   that effect, as well as injunctive relief preventing the state from applying such laws

7   to CTC Members, including but not limited to Plaintiff Motor Carriers.  In addition,

8   Plaintiff seeks a declaration that two state laws, California Labor Code §§ 226.7 and

9   512, as well as portions of the California Industrial Welfare Commission ("IWC")

10  Wage Orders, are preempted by the Federal Aviation Administration Authorization

11  Act of 1994 ("FAAAA"), 49 U.S.C. § 14501 and may not be applied to CTC

12  Members and Plaintiff Motor Carriers on that basis.

### FIRST CLAIM FOR DECLARATORY RELIEF

13  17.   Plaintiffs incorporate herein by reference each and every allegation

14  contained in the foregoing paragraphs, inclusive, as if fully set forth below.

15  18.   A dispute or controversy has arisen concerning whether Defendants'

16  policies and practices of requiring that the independent motor carrier contractors

17  (and their own employees) of leased vehicles contracted by CTC Members,

18  including by not limited to CTC Motor Carriers, to haul drayage to the Ports of

19  Long Beach and Los Angeles, California be treated as employees instead of

20  independent motor carrier contractors, are "state laws" from which such members

21  may be exempted from complying with solely because they may lease trucks from

22  CTC Members pursuant to 49 U.S.C. § 14302(f) because they would prevent the

23  pooling arrangement approved by the federal STB from being carried out.  Plaintiffs

24  contend that the contracted independent motor carrier contractors are not, and never

25  have been, statutory employees of any CTC Members.  To the contrary, Defendants

26  contend that they are statutory employees and fully intend to continue enforcing

27  such policies with the intention of requiring CTC Members to treat the independent

AIKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

014078.00008
10707473.1

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

1   motor carrier contractors as employees irrespective of whether they satisfy the

2   criteria of independent motor carrier contractors under applicable law and

3   irrespective of the effect such determinations will have on the federally-approved

4   pooling agreement and the explicit recognition of Section 14302.

5           19.   A declaration of the parties' rights and interests is necessary and

6   required in order to resolve this dispute and to determine the question as to whether

7   CTC Members, including but not limited to Plaintiff Motor Carriers, are exempt

8   from the state's policies and practices pursuant to 49 U.S.C. § 14302. A declaratory

9   judgment is both necessary and proper under the Declaratory Judgment Act, 28

10   U.S.C. § 2201, *et seq.*, to determine the rights, obligations and liabilities that exist

11   among and between the parties.

**SECOND CLAIM FOR INJUNCTIVE RELIEF**

13           20.   Plaintiffs incorporate herein by reference each and every allegation

14   contained in the foregoing paragraphs, inclusive, as if fully set forth herein.

15           21.   The Defendants' continued processing, investigation, and adjudication

16   of claims involving the issue of whether independent motor carrier contractors that

17   lease trucks from CTC Members are employees or independent contractors have

18   caused and will continue to cause CTC Members, including Plaintiff Motor Carriers,

19   irreparable harm so as to warrant a temporary restraining order, preliminary

20   injunction, and permanent injunction. Plaintiffs request that the Court issue an order

21   prohibiting the Labor Commissioner and the EDD from investigating, processing, or

22   proceeding to hearing on any claim against CTC Members, including but not limited

23   Plaintiff Motor Carriers, based on the contention that the independent motor carrier

24   contractors of leased vehicles contracted by CTC Members to haul drayage to and

25   from the Ports be treated as employees instead of independent contractors. Such an

26   order will maintain the status quo and permit this case to move forward to a final

27   declaratory judgment with respect to the issue of whether the state's enforcement

28   policies are "state laws" from which CTC Members are completely exempt from

complying with pursuant to 49 U.S.C. § 14302(f) because such enforcement actions would necessarily prevent the pooling arrangements approved by the STB from being carried out.

22.    There is a strong likelihood that Plaintiff CTC and Plaintiff Motor Carriers will prevail on the merits, in that the state laws in question are clearly "state laws" which CTC Members, including but not limited to Plaintiff Motor Carriers, are or should be exempted from for purposes of effectuation of the pooling agreement under 49 U.S.C. Section 14302(f).

23.    CTC and its Members, including but not to Plaintiff Motor Carriers, will suffer irreparable injury if injunctive relief is not granted, because they will not be able to continue to utilize independent motor carrier contractors for port drayage purposes, and to share independent motor carrier contractors, leased equipment, and other services as their business needs dictate and as the pooling arrangement permits, if Defendants are permitted to categorize and treat the independent motor carrier contractors as "employees" under the law as it is their intention of doing in their audits and investigations.

24.    The balance of hardships tips sharply in the favor of CTC and its Member, including but not limited to Plaintiff Motor Carriers, in that by virtue of attempting to reclassify existing independent motor carriage, central to the pooling arrangements, as employee-based transportation, the CTC Members will not be permitted to continue to operate under the federally-approved pooling agreement in respect to their Port drayage operations absent the injunctive relief mandated by this Complaint.

25.    The public interest will be advanced by precluding the interference with the federal STB's decision by the effects of the state laws in issue, which Plaintiffs are or should be exempted from complying with pursuant to federal law.

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

014078.00008
10707473.1

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

## THIRD CLAIM FOR DECLARATION OF PREEMPTION OF CALIFORNIA LABOR CODE §§ 226.7 AND 512, AND 8 CAL. CODE REGS. §§ 11090.11 & 12 BY THE FAAAA

26.     Plaintiffs incorporate herein by reference each and every allegation contained in the foregoing paragraphs, inclusive, as if fully set forth herein.

27.     Among the state laws that Defendants seek to impose on the CTC Members, including but not limited to Plaintiff Motor Carriers, are California Labor Code §§ 226.7 and 512.  The application of each of these state laws to CTC and its members is preempted by the FAAAA because these statutes and regulations directly affect CTC's prices, routes, and services.

28.     The FAAAA preempts laws that are related to prices, routes, or services.  Section 14501(c) "Motor Carriers of Property" provides:

> (1)     General rule.--Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

> (2)     Matters not covered.--Paragraph (1)--

> (A)     shall not restrict the safety regulatory authority of a State with respect to motor vehicles . . ."

49 U.S.C § 14501.

29.     Congress enacted the FAAAA in 1994 to extend to "motor private carriers" the "identical intrastate preemption of prices, routes and services as that originally contained in the Airline Deregulation Act [of 1978, 49 U.S.C. Section 41713(b) (the "ADA")]."

014078.00/638
10707473.1

30. If the state laws are applied to independent motor carrier contractors, who contract with the CTC Members, including but not limited to Plaintiff Motor Carriers, so that they are considered employees, the CTC Members, including but not limited to Plaintiff Motor Carriers, may become liable for premium pay under Labor Code Section 226.7 for failure to provide meal and rest periods under Labor Code Section 512 and I.W.C. Wage Order 9. Section 226.7 of the California Labor Code reads in part as follows:

> (a) No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission.
>
> (b) If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided.

According to this section, the CTC Members, including but not limited to Plaintiff Motor Carriers, would have to pay a premium of an hour's pay due to its independent drivers for missed meal or rest periods during which time they worked.

31. The requirement of a meal period is found in Section 512 of the California Labor Code, which reads in part as follows:

> (a) An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee. An employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

014078.00008
10707473.1

> waived by mutual consent of the employer and the
> employee only if the first meal period was not waived.

California Labor Code Section 512.   According to this section, the independent

motor carrier contractors, if employees, would have to take a half hour meal period

within the first five hours of their workdays.

32.   I.W.C. Wage Order 9, Title 8, Cal. Code Regs. (C.C.R.) § 11090, also

requires a meal period as well as rest periods.   Section 11 of Wage Order 9: "Meal

Periods," reads as follows:

> (A) No employer shall employ any person for a work
> period of more than five (5) hours without a meal period
> of not less than 30 minutes, except that when a work
> period of not more than six (6) hours will complete the
> day's work the meal period may be waived by mutual
> consent of the employer and the employee.
>
> (B) An employer may not employ an employee for a work
> period of more than ten (10) hours per day without
> providing the employee with a second meal period of not
> less than 30 minutes, except that if the total hours worked
> is no more than 12 hours, the second meal period may be
> waived by mutual consent of the employer and the
> employee only if the first meal period was not waived.

Section 12 of Wage Order 9: "Rest Periods," reads as follows:

> (A) Every employer shall authorize and permit all
> employees to take rest periods, which insofar as
> practicable shall be in the middle of each work period. The
> authorized rest period time shall be based on the total
> hours worked daily at the rate of ten (10) minutes net rest
> time per four (4) hours or major fraction thereof.
> However, a rest period need not be authorized for
> employees whose total daily work time is less than three
> and one-half (3 ½) hours.   Authorized rest period time
> shall be counted as hours worked for which there shall be
> no deduction from wages.

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

014078.00008
10707473.1

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEY'S AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

> (B) If an employer fails to provide an employee a rest period in accordance with the applicable provisions of this order, the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided.

As application of Labor Code Sections 226.7 and 512 and Wage Order 9 directly impact the CTC Members, including but not limited to Plaintiff Motor Carriers', rates, routes, and services, they are preempted by the FAAAA.

33.    If the independent motor carrier contractors were relieved of duty during the meal periods, such non-work time in the middle of the day extends the time by which deliveries can be made to CTC Members' customers.  Since the delivery time is longer than it would otherwise be if the independent motor carrier contractors were not obligated to stop and take meal periods on the road, the prices CTC Members charge their customers are correspondingly higher.  Further, the length of the interruption to the work day often may be much longer than 30 minutes as the independent motor carrier contractor is required to find a safe place to pull over and must actually park and shut down the equipment before the break can start.  This would require that the independent motor carrier contractors return to the equipment, start it, and get back on the road as well.  Furthermore, California laws restrict drivers from parking wherever they wish, for example, California law prohibits double parking (Vehicle Code Section 22500(h)), and blocking any driveway (Vehicle Code Section 22500(e)).  The independent motor carrier contractors sometimes take longer to find a legal place to park because the trucks cannot be parked in many locations where standard sized vehicles could park.  The burden can be exacerbated in congested areas.

34.    Also, because CTC Members would have to reorder the independent motor carrier contractor's routes to comply with the state laws in order to give the independent motor carrier contractors appropriate stopping points, those routes necessarily increase CTC Members' fleet costs by increasing miles driven, fuel

01-0978 00008
10707473.1

consumption, and vehicle wear and tear. This increased cost is directly passed to CTC Members' customers in the form of higher prices.

35.     CTC Members' prices would also be affected by California's meal and rest period requirements because if CTC Members fail to provide the independent motor carrier contractors with meal and rest breaks, labor costs increase due to the one-hour pay premiums owed under Wage Order 9 and Labor Code § 226.7 incurred for the missed-meal and rest periods, thereby increasing delivery charges to customers. Such premiums may be up to two a day per driver; one for the meal period that was not provided and a second for any rest periods that were not allowed. To the extent CTC Members failed to provide the independent motor carrier contractors with meal and rest periods as required by Wage Order 9 and the Labor Code sections and thereby incur the obligation to pay additional premiums, their annual labor costs would increase substantially. Labor costs are also inflated by any penalties due to independent motor carrier contractors for missed meal and rest periods resulting from independent motor carrier contractors being required to arrange a route in a less-than-optimally efficient order merely to fit in a meal break within the first five hours and meet customer needs.

36.     Another substantial effect on prices in California is the fact that due to California's meal and rest period requirements, independent motor carrier contractors lose 1-1/2 hours (two 30 minute meal breaks and three 10-minute rest breaks) over the course of the permitted 14 hour on-duty period authorized by the Federal Motor Carrier Safety Administration's hours of service regulations during which the independent motor carrier contractor can neither drive nor perform on-duty driving tasks. 49 CFR Section 395.3. The practical effect is that an independent motor carrier contractor in California has only 12-1/2 hours of on-duty time after initially coming on duty during which he can accumulate his or her 11 hours of driving time, leaving only 1-1/2 hours to perform any other duty non-driving tasks that might naturally occur during the day. To comply with California's

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

1    meal and rest period requirements for independent motor carrier contractors subject

2    to the hours of service regulations, time allocated to loading and other non-driving

3    tasks would be directly affected.

4        37.    Congress enacted the FAAAA to prevent the states from increasing

5    burdens on and interfering with interstate motor vehicle transportation. Regulations

6    that have a significant effect on a motor carrier's prices, routes, or services are

7    preempted. California's meal and rest break laws clearly impact CTC Members'

8    prices, routes, and services, as CTC Members' prices would be lower without them,

9    the independent motor carrier contractors take different routes because of them, and

10   CTC Members' services are not as efficient because of them. The safety exception

11   to the FAAAA does not apply to the meal and rest break laws, as nowhere in the

12   legislative history does it indicate that the laws were enacted to specifically promote

13   motor vehicle safety. The FAAAA therefore applies to the meal and rest period

14   laws and preempts the laws as applied to the independent motor carrier contractors.

15       38.    Defendants, and each of them, dispute that any of the above-referenced

16   laws are preempted by the FAAAA, and are seeking to enforce them against

17   Plaintiffs and Plaintiff CTC's members. A declaration of the parties' rights and

18   interests is therefore necessary and required under 28 U.S.C. § 2201, *et seq.* and the

19   FAAAA in order to resolve this dispute and to determine whether these laws can be

20   applied to Plaintiffs' operations.

21       WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

22       On its First Claim for Declaratory Relief

23       1.    The Court determine and declare that the Defendants' policies and

24   practices of requiring that the independent motor carrier contractors of leased

25   vehicles contracted by Plaintiff CTC Members, including but not limited to the

26   Plaintiff Motor Carriers, to transport goods to and from the Ports of Long Beach and

27   Los Angeles, California be treated as employees instead of independent contractors,

28   are "state laws" from which such CTC Members, including but not limited to

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

014078.00008
10707473.1

Plaintiff Motor Carriers are exempt pursuant to 49 U.S.C. § 14302(f) because they would prevent the pooling arrangement approved by the federal Surface Transportation Board from being carried out;

     2.    For its attorneys' fees and costs of suit herein; and

     3.    For such other and further relief as the Court deems just and proper.

<u>On its Second Claim and Injunctive Relief</u>

     1.    Issue a Temporary Restraining Order prohibiting the Labor Commissioner and the EDD from investigating, processing, or proceeding to hearing on any claim against the CTC Members, including but not limited to Plaintiff Motor Carriers, based on the contention that the independent motor carrier contractors of leased vehicles contracted by the CTC Members to haul drayage to the Ports of Long Beach and Los Angeles, California be treated as employees instead of independent contractors, on the grounds that they constitute "state laws" from which such members are exempt from complying with pursuant to 49 U.S.C. § 14302(f) because they would prevent the pooling arrangement approved by the federal STB from being implemented and carried out as authorized by the STB;

     2.    Grant a Preliminary Injunction, and thereafter a Permanent Injunction, pursuant to Federal Rule of Civil Procedure 65, prohibiting the Labor Commissioner and the EDD from investigating, processing, or proceeding to hearing on any claim against any CTC Members, including but not limited to the Plaintiff Motor Carriers, based on the contention that the independent motor carrier contractors of leased vehicles contracted by the CTC Members to haul product to and from the Ports of Long Beach and Los Angeles, California be treated as employees instead of independent contractors, on the grounds that they constitute "state laws" from which such members are exempt from complying with pursuant to 49 U.S.C. § 14302(f) because Defendants would necessarily prevent the pooling arrangement from being implemented and carried out as approved by the Surface Transportation Board, thereby frustrating and defeating the formal action of this federal agency;

ATKINSON, ANDELSON, LOYA, KUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

01-0978.00008
10707473.1

3.     For its attorneys' fees and costs of suit herein; and

4.     For such other and further relief as the Court deems just and proper.

On its Third Claim for a Declaration of Preemption of California Statutes:

1.     For declaration that California Labor Code §§ 226.7 and 512 and 8 C.C.R. § 11090.11 and 12 are preempted by the FAAAA and that the CTC Members, including but not limited to the Plaintiff Motor Carriers, are not legally obligated to comply with them with respect to drivers of vehicles leased by the CTC Members;

2.     For its attorneys' fees and costs of suit herein; and

3.     For such other and further relief as the Court deems just and proper.

Dated: _____

ATKINSON, ANDELSON, LOYA, RUUD & ROMO

By: _____
Ronald W. Novotny
Attorneys for Plaintiff Clean Truck Coalition, LLC and Member Motor Carriers

ATKINSON, ANDELSON, LOYA, RUUD & ROMO
A PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
12800 CENTER COURT DRIVE SOUTH, SUITE 300
CERRITOS, CALIFORNIA 90703-9364
TELEPHONE: (562) 653-3200
FAX: (562) 653-3333

014078.00008
10707473.1

# EXHIBIT 1

# CTC

# Pooling Agreement

# Operating Agreement

OPERATING AGREEMENT
OF
CLEAN TRUCK COALITION, LLC,
a California limited liability company

This Operating Agreement of Clean Truck Coalition, LLC, a California limited liability company ("**Agreement**"), dated for reference purposes only June 2, 2009, is entered into by and between: (i) Green Fleet Systems, LLC, a Delaware limited liability company ("**Green Fleet**"); (ii) California Intermodal Associates, Inc., a California corporation ("**CIA**"); (iii) Fox Transportation, Inc., a California corporation ("**Fox**"); (iv) Golden State Express, Incorporated, a California corporation ("**Golden State**"); (v) Harbor Division, Inc., a California corporation ("**Harbor Division**"); (vi) Overseas Freight Inc., a California corporation ("**Overseas Freight**"); (vii) Pacific 9 Transportation, Inc., a California corporation ("**Pacific 9**"); (viii) Progressive Transportation Services, Inc., a California corporation ("**Progressive**"); (ix) Southern Counties Express, Inc., a California corporation ("**Southern Counties**"); and, (x) Total Transportation Services, Inc., a California corporation ("**TTSI**"). Green Fleet, CIA, Fox, Golden State, Harbor Division, Overseas Freight, Pacific 9, Progressive, Southern Counties, and TTSI re referred to in this Agreement collectively as "**Members**" and separately as "**Member**".

Recitals

A.     The Members are motor carriers who conduct regional transportation operations in the Los Angeles, California and Long Beach, California areas. Each Member is a participant in the San Pedro Bay Ports Clean Air Action Plan and the related Clean Truck Program ("**Program**"). The Program is a component of a Clean Air Action Plan whose goal is to reduce emissions generated by transportation operations in the area surrounding the San Pedro Bay Ports. Each Member is and at all times shall be a Licensed Motor Carrier ("**LMC**") under the Program established by the Port of Los Angeles and the Port of Long Beach, respectively.

B.     The Members desire to enter into this Operating Agreement in order to facilitate their ability to leverage their resources for the benefit of the Members with regard to the Program and their respective participation in same. Specifically, the Members desire to enhance each Member's ability to participate in the Program by interchanging the specialized, environmentally-sound equipment and creating a purchasing program for equipment, materials, and other operating assets including insurance and leased vehicles.

NOW, THEREFORE, the Members agree as follows:

Agreement

1.     <u>Effective Date</u>. This Agreement shall be effective as of the date that the U.S. Surface Transportation Board approves the Agreement.

2.     <u>Organization</u>.

2.1   <u>Formation</u>. The Members hereby agree to form a California limited liability company ("**LLC**"), which LLC shall be governed by and in accordance with the provisions of the Beverly-Killea Limited Liability Company Act, as set forth in Sections 17000, *et seq.*, of the California Corporations Code ("**Act**").

1878098 6

**2.2**    Name.  The LLC's name shall be "Clean Truck Coalition, LLC", and the LLC's business shall be conducted under such name.

**2.3**    Principal Place of Business.  The LLC's principal place of business shall be located at: (i) 19530 Alameda Street, Rancho Dominguez, California, 90221; or, (ii) such other place or places in California as the Members may determine from time to time.

**2.4**    Filings.

**2.4.1**    Articles of Organization.  The Members have: (i) executed (or caused to be executed) articles of organization ("**Articles**") in the form required by the Act; and, (ii) filed (or caused to be filed) such Articles with the Secretary of State of California. The Members shall: (i) amend the Articles, if and to the extent required by the Act; and, (ii) file, or cause to be filed, such amended Articles with the Secretary of State of California.

**2.4.2**    Biennial Statement.  Within ninety (90) days after the Articles are filed with the Secretary of State of California pursuant to Section 2.4.1 above, the Members shall:  (i) execute a statement pursuant to Section 17060 of the Act ("**Biennial Statement**"); and, (ii) file (or cause to be filed) such Biennial Statement with the Secretary of State of California.  The Members shall file (or cause to be filed) a renewed Biennial Statement with the Secretary of State of California on a biennial basis in accordance with the Act.

**2.4.3**    Pooling Application.  The Members shall be and are parties to the proceeding before the Surface Transportation Board for approval of a Pooling Application pursuant to 49 U.S.C. § 14302.

**2.5**    Term.  The LLC shall:  (i) commence on the date the Articles are filed with the Secretary of State of California pursuant to Section 2.4.1 above; and, (ii) continue until December 31, 2060, unless sooner terminated in accordance with Section 11 below.

**2.6**    Purpose and Business.  Together with Section 14 hereof, the LLC's business ("**Business**") shall be to manage the pooling of Member assets and resources in order to:  (i) among other things, promote Member participation in the Program by providing a mechanism for load balancing, sharing of equipment and purchasing power for equipment and materials; and, (ii) to acquire, own, operate, manage, and/or hold for investment such assets, if any, which the Members deem advisable from time to time.  The LLC shall have the power to do all acts and things in furtherance of, and incidental to, such Business.  For these purposes, the Members agree that each will lease clean trucks owned and operated by each Member to the other Members pursuant to this Agreement and in accordance with applicable federal law and regulation.

**2.7**    Percentage Interests.  As used in this Agreement, a Member's "**Percentage Interest**" shall mean the percentage set forth below opposite such Member's name:

| | |
|---|---|
| Green Fleet | 10% |
| CIA | 10% |
| Fox | 10% |
| Golden State | 10% |
| Harbor Division | 10% |
| Overseas Freight | 10% |

1878098 6

| Pacific 9 | 10% |
| Progressive | 10% |
| Southern Counties | 10% |
| TTSI | 10% |

As used in this Agreement, "**Percentage Interests**" shall mean the aggregate of the foregoing percentages, if and to the extent appropriate in the context.

3.    **Capital.**

3.1    **Initial Capital Contributions.** In connection with the formation of the LLC, the Members shall each contribute _____ Thousand and no/100ths Dollars ($___,000.00) to the capital of the LLC for which each Member shall receive a corresponding credit to its Capital Account (as defined below).

3.2    **Additional Capital Contributions.**

3.2.1    **No Obligation.** No Member shall be obligated to contribute additional capital to the LLC.

3.2.2    **Members' Discretion.** If those Members who hold a majority of the Percentage Interests held by all Members ("**Majority of Percentage Interests**") determine that the LLC requires additional funds or assets to conduct its business, then a Majority of Percentage Interests may obtain such funds by one or more of the following methods:

(a)    A Majority of Percentage Interests may cause the LLC to borrow the required funds or assets from third parties upon such terms and conditions as the Majority of Percentage Interests deems to be commercially reasonable at the time;

(b)    A Majority of Percentage Interests may permit one or more Members to make one or more loans to the LLC (collectively, "**Member Loans**" and separately, "**Member Loan**"). Each Member Loan shall be evidenced by the LLC's promissory note. The principal balance of a Member Loan, outstanding from time to time, shall bear interest at an annual rate equal to the most recent prime rate published in the Wall Street Journal from time to time ("**Prime Rate**"), plus five percent (5%), payable monthly. The LLC shall repay the entire principal balance of each Member Loan, together with interest thereon, prior to making distributions to any Member under Sections 4.2 or 11.3(c) below. All payments which the LLC makes on a Member Loan shall be treated as payments made to a partner not acting in its capacity as a partner under Section 707(a) of the Internal Revenue Code of 1986, as amended ("**Code**");

(c)    A Majority of Percentage Interests may make a call on all Members to contribute the necessary funds or assets to the capital of the LLC. In such event, each Member shall have the right, but not the obligation, to contribute to the capital of the LLC that portion of the required additional funds or assets that is in the same proportion as the Percentage Interest of such Member is to the aggregate Percentage Interests of all Members. A Majority of Percentage Interests shall give written notice to each Member of: (i) the total amount of required additional capital; and, (ii) such Member's proportionate share thereof. Each Member shall have fifteen (15) days from the date such notice is given to contribute its proportionate share of the required additional capital to the LLC. If any Member

1878098.6

contributes less than its proportionate share of the required additional capital, each other Member may contribute that portion of the resulting deficiency ("**Deficiency Contribution**") which is in the same proportion as the Percentage Interest of such other Member is to the aggregate Percentage Interests of all Members who desire to contribute such deficiency. Each Member shall receive a credit to its Capital Account in an amount equal to the fair market value, net of liabilities, of any additional capital which such Member contributes to the LLC pursuant to this subsection (c).

      **3.3**   **No Withdrawal.** Except as expressly provided otherwise in this Agreement, no Member shall have the right, without the other Members' prior written consent, to:  (i) withdraw from the LLC; or, (ii) withdraw all or any part of the Member's capital contributions from the LLC.  A Member's withdrawal, or attempt to withdraw, from the LLC in violation of this Section 3.3 shall constitute such Member's default under this Agreement.

      **3.4**   **Return of Capital/Distributions.** No Member guarantees:  (i) the return of any other Member's capital contributions or any other investment in the LLC; or, (ii) the LLC's distribution of any amounts under Section 4.2 or 11.3(c) below.  Each Member acknowledges and understands that the other Members have not, at any time, expressly or implicitly represented, guaranteed, or warranted that:  (i) any amount of profit will be realized as a result of an investment in the LLC; or, (ii) any cash distributions from LLC operations or otherwise will be made to Members (or any of them) by any specific date or will be made at all.

      **3.5**   **Capital Account.** The LLC shall establish and maintain an individual capital account for each Member (collectively, "**Capital Accounts**" and separately, "**Capital Account**"), which Capital Account shall be determined and maintained in accordance with the provisions set forth in Treasury Regulations Section 1.704-1(b)(2)(iv).

    **4.**   **Distributions.**

      **4.1**   **Cash Available for Distribution.** As used in this Agreement, "**Cash Available for Distribution**" shall mean the amount of cash which a Majority of Percentage Interests deems available for distribution to the Members, taking into account, among other factors:  (i) all LLC obligations then due and payable (including, without limitation, any compensation payable under Section 6.5 below); (ii) anticipated LLC expenditures; (iii) amounts placed into reserves to satisfy customary and usual claims with respect to the LLC's business; and, (iv) anticipated LLC investments.

      **4.2**   **Manner of Distribution.** During the term of the LLC, the LLC shall distribute Cash Available for Distribution to the Members in the following order of priority:

          **(a)**   First, to the Members, pro rata, in proportion to their respective unreturned Deficiency Contribution made pursuant to Section 3.2.2(c) above, until each Member shall receive distributions under this subsection (a) in an amount which, in the aggregate, equals the Member's Deficiency Contribution;

          **(b)**   Second, to the Members, pro rata, in proportion to their respective unreturned capital contributions, until each Member has received distributions under this subsection (b) in an amount which, in the aggregate, equals the Member's capital contributions; and,

(c)   Thereafter, to the Members, pro rata, in accordance with their respective Percentage Interests.

**4.3   Time of Distribution.** Subject to Section 4.4 below, the LLC shall distribute Cash Available for Distribution to the Members pursuant to Section 4.2 above at such times as a Majority of Percentage Interests shall determine.

**4.4   Limitations on Distributions.** The LLC may not make a distribution pursuant to this Section 4 if, after giving effect to such distribution: (i) the LLC would not be able to pay its debts as they become due in the usual course of business; or, (ii) the LLC's total assets would be less than the sum of its total liabilities. This Section 4.4 is intended to comply with Section 17254 of the Act and shall be construed consistently therewith.

**4.5   Recontribution of Distributions.** The Members understand and acknowledge that they are obligated to recontribute LLC distributions to the extent required by Section 17254(e) of the Act. Each Member shall pay to the LLC that portion of any required recontribution that is in the same proportion as the total amount of distributions which such Member has received over the entire term of the LLC is to the aggregate amount of distributions which all Members have received over such period.

**4.6   Withholding.** The LLC shall withhold and pay all withholding taxes to the California Franchise Tax Board in accordance with the provisions set forth in Section 18662 of the California Revenue & Taxation Code. Any Member who is or who becomes a nonresident of California within the purview of Section 18662 of the California Revenue & Taxation Code shall notify the LLC and the other Members in writing of his or her status as a non-resident Member no later than the date by which the LLC must make the requisite withholdings. If a nonresident Member fails to so notify the LLC, then such nonresident Member shall indemnify, defend, and hold harmless the LLC and the other Members from and against any and all losses, claims, expenses, damages, or liabilities, of any kind (including taxes, interest, assessments, or penalties), arising out of, or in connection with, the LLC's failure to withhold on behalf of such nonresident Member in accordance with this Section 4.6.

**5.   Profits and Losses.**

**5.1   Determination.** LLC profits and losses shall be determined in accordance with Sections 703 and 704 of the Internal Revenue Code of 1986, as amended ("**Code**"), and the Treasury Regulations promulgated thereunder.

**5.2   Allocation.**

**5.2.1   Profits.** Subject to Section 5.3 below, LLC profits shall be allocated to the Members in the following order of priority:

(a)   First, to the Members in the amount of any losses previously allocated to them under Sections 5.2.2(b) and 5.2.2(c) below (to the extent such losses have not been offset by prior profit allocations under this subsection (a)). Allocations pursuant to this subsection (a) shall be made in proportion to the respective amounts required to be allocated to each Member under this subsection (a); and,

(b)   Thereafter, to the Members, pro rata, in accordance with their respective Percentage Interests.

1878098 6

**5.2.2   Losses.** Subject to Section 5.3 below, LLC losses shall be allocated to the Members in the following order of priority:

**(a)**    First, to the Members in the amount of any profits previously allocated to them under Section 5.2.1(b) above (to the extent such profits have not been offset by prior loss allocations under this subsection (a)). Allocations pursuant to this subsection (a) shall be made in proportion to the respective amounts required to be allocated to each Member under this subsection (a);

**(b)**    Thereafter, to the Members, pro rata, in accordance with their respective Percentage Interests; and,

**(c)**    Notwithstanding subsections (a) and (b) immediately above, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of "**LLC Minimum Gain**" (which term shall have the same meaning as the term "**Partnership Minimum Gain**" as defined in Treasury Regulations Section 1.704-2(d)) that would be realized on a foreclosure of the LLC's property. Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited in respect of the allocation of losses under this subsection (c)). Any loss reallocated under this subsection (c) shall be taken into account in computing subsequent allocations of income and losses pursuant to this Section 5, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Section 5, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Section 5 if no reallocation of losses had occurred under this subsection (c).

**5.3    Special Allocations.**

**5.3.1    Minimum Gain Chargeback.** If there is a net decrease in LLC Minimum Gain during any LLC fiscal year, each Member shall be specially allocated items of LLC income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to the portion of such Member's share of the net decrease in LLC Minimum Gain that is allocable to the disposition of LLC property subject to a "**Nonrecourse Liability**" (as defined in Treasury Regulations Section 1.752-1(a)(2)), which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(g)(2). Allocations pursuant to this Section 5.3.1 shall be made in proportion to the respective amounts required to be allocated to each Member under this Section 5.3.1. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f). This Section 5.3.1 is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

**5.3.2    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt.** If there is a net decrease in LLC Minimum Gain attributable to a "**Member Nonrecourse Debt**" (which term shall have the same meaning as the term "**Partner Nonrecourse Debt**" as defined in Treasury Regulations Section 1.704-2(b)(4)) during any LLC fiscal year, each Member who has a share of the LLC Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)) shall be specially allocated items of LLC income and gain for such fiscal year (and, if necessary, in subsequent fiscal years) in an amount equal to that portion of such Member's share of the net decrease in LLC Minimum Gain attributable to such

Member Nonrecourse Debt that is allocable to the disposition of LLC property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(5)). Allocations pursuant to this Section 5.3.2 shall be made in proportion to the respective amounts required to be allocated to each Member under this Section 5.3.2. The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(i)(4). This Section 5.3.2 is intended to comply with the minimum gain chargeback requirement contained in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

      5.3.3   <u>Nonrecourse Deductions</u>. Any nonrecourse deductions (as defined in Treasury Regulations Section 1.704-2(b)(1)) for any fiscal year or other period shall be specially allocated to the Members, pro rata, in accordance with their respective Percentage Interests.

      5.3.4   <u>Member Nonrecourse Deductions</u>. Items of LLC loss, deduction, or Code Section 705(a)(2)(B) expenditures attributable to Member Nonrecourse Debt for any fiscal year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Treasury Regulations Section 1.704-2(i).

      5.3.5   <u>Qualified Income Offset</u>. If a Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)-(d)(4), (5), or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of LLC Minimum Gain, items of LLC income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit Capital Account balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 5.3.5 shall be taken into account in computing subsequent allocations of income and gain under this Section 5 so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member under this Section 5 to the extent possible, shall be equal to the net amount that would have been allocated to each such Member under this Section 5 if such unexpected adjustments, allocations, or distributions had not occurred.

      5.3.6   <u>Code Section 704(c) Allocations</u>. Notwithstanding any other provision in this Section 5 to the contrary, income, gain, loss, and deduction with respect to any property contributed to the capital of the LLC shall, solely for tax purposes, be allocated between the Members so as to take account of any variation between the adjusted basis of such property to the LLC for federal income tax purposes and its fair market value on the date of contribution, in accordance with Code Section 704(c) and the Treasury Regulations promulgated thereunder. Allocations pursuant to this Section 5.3.6 are solely for purposes of federal, state, and local taxes. As such, they shall not affect nor be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

      5.3.7   <u>Curative Allocations</u>. The special allocations set forth in this Section 5.3 and Section 5.2.2(c) above ("**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations. It is the Members' intent that, to the extent possible, all Regulatory Allocations be offset with either: (i) other Regulatory Allocations; or, (ii) special allocations of other items of LLC income, gain, loss, or deduction pursuant to this Section 5.3.7. Therefore, notwithstanding any other provision of this Section 5.3 to the contrary (other than the Regulatory Allocations), the Members shall make such offsetting special

1878098 6

allocations in whatever manner the Members determine reasonably appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance each Member would have had if the Regulatory Allocations were not part of this Agreement and all LLC tax items were allocated pursuant to Section 5.2 above. In exercising its discretion under this Section 5.3.7, the Members shall take into account future Regulatory Allocations under Sections 5.3.1 and 5.3.2 above which, although not yet made, are likely to offset other Regulatory Allocations previously made in accordance with the provisions of this Section 5.3.

6.    **Members' Rights and Powers.**

6.1    *In General.* Each Member represents and warrants to each other Member that it is an entity duly organized and validly existing and in good standing under the laws of the State of California. The execution, delivery and performance of this Agreement by each Member has been duly and validly authorized by all necessary company actions on the part of each Member and all required consents or approvals have been duly obtained. This Agreement is a legal, valid and binding obligation of each Member and is enforceable against each Member in accordance with its terms. Except as expressly provided otherwise in this Agreement: (i) each Member shall participate in the control, management, and direction of the LLC's business; (ii) all LLC matters shall be decided by a Majority of Percentage Interests; and, (iii) all acts which require the Members' consent under this Agreement or otherwise shall require the consent of a Majority of Percentage Interests. Without limiting the generality of the foregoing provisions, the Members shall have the right to do each of the following on behalf of the LLC on such terms and conditions as the Majority of Percentage Interests deems to be in the LLC's best interests:

(a)    Negotiate and execute all contracts, leases, option agreements, notes, deeds of trust, grant deeds, agreements for sale, escrow instructions, releases, easements, maps, construction contracts, and other documents and instruments in connection with the LLC's Business, including, without limitation, any amendments thereto;

(b)    Acquire LLC assets;

(c)    Sell, lease, exchange or otherwise dispose of all or any part of the LLC's property;

(d)    Borrow money;

(e)    Encumber all or any part of the LLC's assets;

(f)    Repay (in whole or in part), refinance, increase, modify, or extend any LLC obligation;

(g)    Incur costs and liabilities;

(h)    Disburse funds to pay costs and liabilities;

(i)    Place amounts into reserves for the LLC to satisfy customary and usual claims with respect to the LLC's Business;

-8-

(j)  Employ or discharge, at the LLC's expense, such agents, employees, independent contractors, attorneys and/or accountants;

(k)  Operate and maintain LLC property;

(l)  Obtain insurance necessary for the proper protection of the LLC and the Members;

(m)  Alter the primary business of the LLC;

(n)  Lend LLC funds;

(o)  File a petition for bankruptcy for the LLC or avail the LLC of any insolvency proceeding under state law; and,

(p)  Generally perform daily management duties as required by this Agreement, including without limitation, the pooling objectives set forth herein, as well as the Application to the Surface Transportation Board, which is incorporated herein by this reference.

6.2  <u>Unanimous Consent Required</u>.  Notwithstanding Section 6.1 above, no Member shall do any of the following without the prior written consent of all Members:

(a)  Pledge or hypothecate the credit of the LLC for any purpose other than in furtherance of the LLC's Business;

(b)  Do any act detrimental to the LLC's best interests or which would make it impossible for the Members to carry on the ordinary business of the LLC, except as otherwise expressly provided in this Agreement;

(c)  Possess LLC property or assign a Member's rights in specific LLC property, for other than an LLC purpose;

(d)  Compromise or release any LLC claim without payment in full;

(e)  Confess a judgment for the LLC;

(f)  Submit an LLC claim or liability to arbitration or reference; or,

(g)  Do any act in contravention of this Agreement.

6.3  <u>No Officers</u>.  The LLC shall have no officers, unless such officers are approved in writing by a Majority of Percentage Interests.  The LLC may have a President and one or more Vice Presidents who may, but need not, be a Member.  An officer shall serve in office until he or she resigns or is removed from office.  An officer may resign from office at any time upon thirty (30) days' written notice to the Members.  A Majority of Percentage Interests may remove an officer from office at any time upon written notice to such officer.  The Members may provide for additional officers of the LLC and may alter the powers, duties, and

-9-

compensation of the officers of the LLC as a Majority of Percentage Interests may approve in writing.

6.4     **Board of Governors.** The LLC may, but need not, be managed by a Board of Governors. Such Board shall consist of no fewer than three (3) governors. Each Governor shall be elected by a Majority of Percentage Interests and shall serve in office until he or she resigns or is removed from office. A Governor may resign from office at any time upon thirty (30) days' written notice to the Members. A Majority of Percentage Interests may remove a Governor from office at any time upon written notice to such Governor. The Members may provide for additional Governors to serve on the Board of Governors of the LLC and may alter the powers, duties, and compensation of the Governors of the LLC as a Majority of Percentage Interests may approve in writing.

6.5     **Compensation.**

6.5.1     **In General.** No Member shall be entitled to receive compensation for services rendered to the LLC, unless such compensation is: (i) commercially reasonable under the facts and circumstances; and, (ii) approved in writing by a Majority of Percentage Interests.

6.5.2     **Contracts with Affiliates.** The LLC may enter into an agreement with an affiliate of a Member for the performance of services, provided such agreement: (i) provides for commercially reasonable fees or other monetary payments; and, (ii) is approved in writing by a Majority of Percentage Interests.

6.5.3     **Tax Treatment.** Any compensation which the LLC pays to a Member pursuant to this Section 6.5 shall be treated as a payment made under Code Section 707(a) or 707(c), as the case may be.

6.6     **Reimbursement of Expenses.** Each Member shall be entitled to reimbursement from the LLC for those out-of-pocket expenses which the Member reasonably incurs in the proper conduct of the LLC's business, provided the Member itemizes all reimbursable expenses in reasonable detail.

6.7     **Contracts with Affiliates.** The LLC may enter into an agreement with an affiliate of any Member for the performance of services, provided such agreement provides for commercially reasonable fees and/or other monetary payments. "**Affiliate**" with respect to any Member shall mean: (i) any person or entity directly or indirectly controlling, controlled by, or under common control with, the Member; (ii) any person or entity owning or controlling ten percent (10%) or more of the outstanding voting interests of the Member; (iii) any officer, director, manager, or general partner of the Member; or, (iv) any party who is an officer, director, manager, general partner, trustee, or holder of ten percent (10%) or more of the voting interests of any person or entity described in subsections (i) through (iii) of this sentence. For purposes of this definition, the term "**controls**," "**is controlled by**," or "**is under common control with**" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

6.8     **Indemnification by LLC.** The LLC shall bear the cost of all expenditures and liabilities which a Member incurs in the proper conduct of the LLC's business. To the extent of its assets, the LLC shall indemnify, defend, and hold harmless each Member from and

-10-

against any and all liabilities of every kind, arising in any manner out of, or in connection with, the operation of the LLC's business, except as to those matters arising by reason of the Member's own negligence, fraud, willful misconduct, gross negligence, or breach of this Agreement, whether related to the Agreement, the pooling operations and/or the direct services of each Member.

6.9     <u>Time and Opportunities</u>.

6.9.1   <u>Devotion of Time to LLC Business</u>.  No Member shall be obligated to devote all of his or her business time to the LLC.  Each Member shall devote to the LLC only such time as is reasonably necessary and appropriate to carry out his or her obligations under this Agreement in a diligent, proper, and business-like manner.  Each Member may operate the business of the Member in the normal and consistent custom and practice.

6.9.2   <u>Participation in Non-LLC Activities</u>.  During the term of the LLC, each Member may engage in any business activity, including transportation for its own profit or advantage without the other Members' consent, regardless of whether such activity is similar to or in competition with the LLC's business.  Neither the LLC nor the other Members shall have any right by virtue of this Agreement in or to such independent ventures of a Member or income which such Member derives therefrom.

6.9.3   <u>Limited Liability of Members</u>.  No Member shall be personally liable for the debts, obligations, and/or liabilities of the LLC, except:  (i) as expressly agreed otherwise in writing by the Member; or, (ii) as provided by law.

7.      <u>Administrative Matters</u>.

7.1     <u>Accounting Method</u>.  The LLC's books shall be kept on the method of accounting which the Members select, provided the LLC is permitted under the Code and the Treasury Regulations thereunder to use such method.  The LLC shall prepare, or cause to be prepared, financial statements for financial reporting purposes on such method of accounting, using those accounting principles used to prepare the LLC's federal income tax returns, consistently applied.

7.2     <u>Bank Accounts</u>.  The LLC shall maintain a bank account(s) in which all LLC funds shall be deposited.  Withdrawals of LLC funds from such bank account(s) shall be made only by checks requiring the signature of such person(s) as a Majority of Percentage Interests may designate from time to time.

7.3     <u>Book and Records</u>.

7.3.1   <u>Obligation to Maintain</u>.  The Members shall keep, or cause to be kept, at the LLC's expense, each of the following in compliance with Section 17058 of the Act:

(a)     A current list setting forth, in alphabetical order:  (i) the full name and last known business or residence address of each Member and Economic Interest Holder (as defined below); (ii) the aggregate amount of capital contributed with respect to each Member's and Economic Interest Holder's interest in the LLC; and, (iii) the Percentage Interest attributable to each Member's and Economic Interest Holder's interest in the LLC;

1878098 6

(b)      A copy of the Articles, together with copies of any amendments thereto, and any powers of attorney pursuant to which the Articles and/or amendments thereto were executed;

(c)      A copy of this Agreement, together with copies of any amendments thereto, and any powers of attorney pursuant to which this Agreement and/or amendments were executed;

(d)      Copies of the LLC's federal, state and local income tax and/or information returns and reports, if any, for the six (6) most recent taxable years;

(e)      Copies of the financial statements of the LLC, if any, for the six (6) most recent fiscal years; and,

(f)      Accurate books and records of the LLC's internal affairs for the current and four (4) immediately preceding fiscal years.

7.3.2   **Right to Inspect.**  The Members shall:  (i) maintain those books, records and documents listed in Section 7.3.1 above at the LLC's principal place of business; and, (ii) make such items available at ordinary business hours for inspection and copying by each Member and Economic Interest Holder (or his or her designated agent or attorney) for purposes reasonably related to the interest of such Member or Economic Interest Holder.  Any copies which a Member or Economic Interest Holder makes pursuant to this Section 7.3.2 shall be at such Member's or Economic Interest Holder's expense.

7.3.3   **Obligation to Deliver.**  Upon the request of any Member or Economic Interest Holder, the Members shall deliver, or cause to be delivered, at the LLC's expense, to such Member or Economic Interest Holder copies of those items described under Sections 7.3.1(a), 7.3.1(b), 7.3.1(c) and 7.3.1(d) above; provided, however, such request must be reasonably related to such Member's or Economic Interest Holder's interest in the LLC.

7.4   **Fiscal Year.**  The fiscal year of the LLC shall be:  (i) the calendar year; or, (ii) such other fiscal year as the Majority of Percentage Interests deems to be in the LLC's best interests, provided the LLC is permitted under the Code and the Treasury Regulations promulgated thereunder to use such other fiscal year.

7.5   **Tax Matters.**

7.5.1   **Tax Returns.**  The Members shall prepare and file, or cause to be prepared and filed, at the LLC's expense, all federal and state tax returns on behalf of the LLC in a timely manner.  The Members shall deliver, or cause to be delivered, a copy of each return for any taxable year of the LLC to each Member and Economic Interest Holder within ninety (90) days after the end of each taxable year (subject to any applicable extensions).

7.5.2   **Tax Elections.**  A Majority of Percentage Interests may cause the LLC to make any tax elections available to the LLC under the Code or any state revenue or taxation law.

7.6   **Meetings.**  LLC meetings and/or votes without a meeting, may be (but shall not be required to be) called for any matter on which the Members are entitled to vote in accordance with the provisions set forth in Section 17104 of the Act.

1878098 6

8.      <u>Transfer of LLC Interests</u>.

8.1      <u>Transfer Rights and Restrictions</u>.

A Member may not sell, assign, pledge, hypothecate, or otherwise transfer or encumber all or any part of its Member interest except as provided herein and without the other Members' unanimous prior written consent. Any attempted sale, assignment, pledge, hypothecation, or other transfer or encumbrance of a Member's interest in the LLC in violation of this Section 8.1 shall: (i) constitute such Member's default under this Agreement; and, (ii) be invalid and of no force or effect. Accordingly, such Member shall not be relieved of any of the Member's obligations under the Agreement, and the proposed transferee shall not acquire any rights as a member of this LLC, as such rights are set forth in the Agreement and/or conferred by law.

8.2      <u>Conditions of Transfer</u>. Any transferee who acquires an interest in the LLC in accordance with this Section 8 shall satisfy each of the following conditions:

(a)      The transferee must execute a written agreement whereby such transferee agrees to be bound by all of the terms and conditions set forth in this Agreement;

(b)      The transferee must obtain the consent of the Members to the form of assignment and other documentation pursuant to which the transferee acquires an interest in the LLC;

(c)      The transferee must reimburse the LLC for all reasonable legal and accounting fees and other costs which the LLC incurs a result of the transaction; and,

(d)      The transferee must be an LMC concessionaire and operate clean trucks in accordance with the Program discussed herein and be willing to participate in the pooling arrangements between the Members.

8.3      <u>Status of Transferee</u>.

8.3.1      <u>Status as Member</u>. Upon a transferee's acquisition of a Member's interest in the LLC pursuant to Section 8.1 above and satisfaction of those conditions set forth in Section 8.2 above, the transferee shall succeed to the LLC interest of the transferor Member in the same capacity as the transferor Member held in the LLC. Accordingly, the transferee shall acquire all rights and obligations with respect to title, management, capital, allocations, and distributions which the transferor Member held in the LLC, as such rights and obligations are set forth in this Agreement and/or conferred by law.

8.3.2      <u>Status as Economic Interest Holder</u>. If a transferee acquires all or any part of a Member's interest in the LLC in violation of Section 8.1 above or if any of the conditions set forth in Section 8.2 above are not satisfied by the transferee or waived in writing by the Members, then: (i) the transferor Member shall not be relieved of any of the Member's obligations as a member of the LLC (as such obligations are set forth in this Agreement and/or conferred by law); and, (ii) the transferee shall not be entitled to any rights of a Member (as such rights are set forth in this Agreement and/or conferred by law), other than the right to receive to the extent assigned, those LLC distributions and allocations which the transferor

-13-

Member otherwise would be entitled to receive under this Agreement. Such a transferee shall be referred to in this Agreement as an "**Economic Interest Holder**".

9.   <u>Additional Members.</u>

   9.1   <u>In General</u>. A person or entity who meets all of the qualifications set forth in Section 8.2 may be admitted as an additional member of the LLC (i.e., pursuant to the acquisition of an ownership interest directly from the LLC in exchange for a capital contribution) only with the written consent of all Members, which consent may be withheld for any reason or for no reason at all.

   9.2   <u>Amendment</u>. Upon the admission of an additional member in accordance with Section 9.1 above, such additional member shall execute an amendment to this Agreement evidencing: (i) such additional member's consent to be bound by the terms and conditions set forth in this Agreement; and, (ii) the Members' new interests in LLC profits, losses, distributions, and voting.

   9.3   <u>No Dissolution</u>. The LLC shall not dissolve by reason of either: (i) the admission of an additional member to the LLC pursuant to this Section 9; or, (ii) the death of a Member.

   9.4   <u>STB Approval</u>. The admission of an additional member is contingent upon the approval by the Surface Transportation Board ("STB") and the additional Member's agreement to be bound by this Agreement and any pooling arrangements approved by the STB.

10.   <u>Buy-Out Rights.</u>

   10.1   <u>Defined Terms</u>.

      10.1.1 <u>Terminating Event and Redemption of Member Interest</u>. For purposes of this Section 10, a "**Terminating Event**" shall mean any of the following events which occurs with respect to a Terminated Party (the "**Terminated Party**"):

         (a)   The Terminated Party is in bankruptcy. "**Bankruptcy**" for these purposes shall mean the institution of any proceedings under federal or state laws for relief of debtors, including, without limitation: (i) the filing of a voluntary or involuntary petition under the Federal Bankruptcy Law; (ii) an adjudication as insolvent or bankrupt; (iii) an assignment of property for the benefit of creditors; (iv) the appointment of a receiver, trustee, or conservator of any substantial portion of assets; or, (v) the seizure by a sheriff, receiver, trustee, or conservator of any substantial portion of assets, and the failure, in the case of any of these events, to obtain the dismissal of the proceeding or removal of the conservator, receiver, or trustee within one hundred twenty (120) days of the event;

         (b)   The Terminated Party breaches any material provision contained in this Agreement and such breach remains uncured for a period of at least thirty (30) days from the date another Member gives written notice of the breach to the Terminated Party; provided, however, if the nature of the breach is such that it cannot be cured within said thirty (30)-day period, the Terminated Party shall have such additional time as may be reasonably necessary to cure such breach provided, and for so long as, the curing of such breach is begun promptly and is pursued with diligence to completion;

-14-

      **(c)**     The Terminated Party fails to:  (i) comply with all applicable federal and state laws and regulations governing the operation of the Terminated Party's business; (ii) maintain its status as a licensed motor carrier; (iii) fails to maintain appropriate safety ratings and classifications in compliance with Federal Motor Carrier Safety Administration rules and regulations;

      **(d)**     A majority interest in the stock or assets of the Terminated Party and sold to a third-party;

      **(e)**     The Terminated Party is no longer an LMC;

      **(f)**     The Terminated Party no longer operates any clean trucks in accordance with the Program;

      **(g)**    The Terminated Party forfeits or relinquishes any and all federal and state operating registrations or permits necessary to the operations of the Terminated Party;

      **(h)**     The Terminated Party conducts its business contrary to applicable laws and regulations related to the activities of a motor carrier; and,

      **(i)**     The Terminated Party refuses or fails to actively and financially support and participate in the joint programs developed by the Members to support the activity to engage in beneficial pooling operations and services.

      **10.1.2** <u>Terminated Membership Interest</u>.  For purposes of this Agreement, "**Terminated Membership Interest**" shall mean any interest which a Terminated Party possesses in the LLC.

      **10.2**    <u>LLC's Right to Liquidate</u>.  Upon the occurrence of a Terminating Event, the LLC shall liquidate the Terminated Party's Member Interest in accordance with the following provisions:

      **(a)**     Within thirty (30) days after the Terminating Event, the Terminated Party (his or her executor, administrator, or personal representative, as the case may be) shall give written notice of such Terminating Event to the LLC;

      **(b)**     The LLC may liquidate the entire Terminated Membership Interest for an amount equal to the then outstanding balance of the Capital Account attributable to the Terminated Membership Interest, as determined after adjusting such Capital Account by the Terminated Membership Interest's allocable share of all LLC income and losses up to the date of the Terminating Event, including any income or loss which the LLC would have recognized if it were to sell its assets for their then fair market value.  Fair market value for these purposes shall be determined in accordance with Section 10.4.1 below, less ten percent (10%) of such amount.  The Members agree that such discount constitutes their reasonable estimate of the cost of borrowing money, additional legal and accounting fees, and a margin of error due to the forced nature of the transaction;

      **(c)**     Amounts payable in liquidation of the Terminated Membership Interest shall be paid in accordance with Section 10.4.2 below.

1878098 6

### 10.3    Terms of Buy-Out Upon Termination.

10.3.1 Redemption price. Except as the LLC and Terminated Member may otherwise agree with the consent of a majority of non-liquidating Members, for purposes of Section 10.2 above, the LLC and the Terminated Seller shall determine the fair market value of the LLC's assets. For purposes of Section 10.3 above, the purchasing Member(s) and the Terminated Seller shall determine the fair market value of the Terminated Membership Interest. For purposes of this Section 10.4, the term **"Purchaser"** shall refer to the purchasing party. If the Purchaser and the Terminated Seller cannot agree upon a fair market value within thirty (30) days after the Purchaser gives written notice to the Terminated Seller of its election, independent appraisers shall determine such fair market value in the following manner:

(a)    The Purchaser shall select one (1) appraiser and send written notice thereof to the Terminated Seller within thirty (30) days after the end of the thirty (30)-day period described above. The Terminated Seller shall either: (i) agree to the appraiser which the Purchaser has selected; or, (ii) select a second appraiser by giving written notice thereof to the Purchaser within thirty (30) days after the end of said thirty (30)-day period. The Terminated Seller's failure to give such notice within said thirty (30)-day period shall constitute its agreement to the appraiser which the Purchaser has selected. Each appraiser selected in accordance with this subsection (a) shall: (i) be a member of a recognized professional organization for appraisers; and, (ii) have at least ten (10) years' experience in appraising assets similar to the LLC's assets;

(b)    The appraiser(s) selected in accordance with subsection (a) above shall determine the fair market value of the Terminated Membership Interest or the LLC's assets, as the case may be, within sixty (60) days after the last appraiser is selected;

(c)    If the Purchaser's appraiser is the only appraiser selected pursuant to subsection (a) above, then the fair market value set forth in the appraiser's appraisal shall constitute the fair market value of the Terminated Membership Interest or the LLC's assets, as the case may be;

(d)    If two (2) appraisers are selected pursuant to subsection (a) above and the fair market values set forth in their respective appraisals are within ten percent (10%) of one another, then the fair market value of the Terminated Membership Interest or the LLC's assets, as the case may be, shall equal the average of the two (2) appraisals;

(e)    If two (2) appraisers are selected pursuant to subsection (a) above and the fair market values set forth in their respective appraisals are not within ten percent (10%) of one another, then the two (2) appraisers shall appoint a third appraiser. Any third appraiser shall: (i) be a member of a recognized professional organization for appraisers; and, (ii) have at least ten (10) years' experience in appraising assets similar to the LLC's assets. Such third appraiser shall determine the fair market value of the Terminated Membership Interest or the LLC's assets, as the case may be, within thirty (30) days after his or her appointment. The two (2) appraisals which are nearest in amount shall be retained and the third appraisal shall be discarded. The fair market value of the Terminated Membership Interest or the LLC's assets, as the case may be, shall equal the average of the two (2) retained appraisals; provided, however, if one (1) appraisal is the average of the other two (2) appraisals, such appraisal shall constitute the fair market value of the Terminated Membership Interest or the LLC's assets, as the case may be;

1878098 6

(f)      The Purchaser and the Terminated Seller shall bear the cost of their respective appraisers.  The Purchaser and the Terminated Seller shall each bear one-half (1/2) of the cost of any third appraiser; and,

(g)      At any time during the appraisal process and prior to final determination:  (i) a party may accept the other party's value; or, (ii) the parties may negotiate a mutually agreeable value, whereupon the appraisal process shall terminate.

10.3.2  **Payment of Redemption Price.**  The Purchaser shall pay the purchase price for a Terminated Membership Interest as follows:  the Purchaser shall pay at least fifteen percent (15%) of the purchase price in cash at closing and the balance by his or her promissory note.  The promissory note shall:  (i) be in a form reasonably satisfactory to the Terminated Seller and the Purchaser; (ii) mature not later than the earlier of five (5) years following closing or the date on which the LLC sells all or substantially all of its property; (iii) be payable in equal monthly installments of principal and interest; (iv) provide for the first payment due and payable thirty (30) days following closing; (v) bear interest at an annual rate equal to the long-term Applicable Federal Rate for the month in which the closing occurs; (vi) provide for prepayment without a prepayment penalty; and, (vii) be secured by a security interest against the Terminated Membership Interest.

10.3.3  **Closing.**  Any liquidation or purchase pursuant to this Section 10 shall close not later than thirty (30) calendar days after the final determination of fair market value of the Terminated Membership Interest or the LLC's assets, as the case may be, in accordance with Section 10.4.1 above (subject to any required confirmation of the sale by the court having jurisdiction over a Terminated Member's estate).

10.3.4  **Costs/Prorations.**  Subject to Section 10.4.1(f) above, the Purchaser and the Terminated Seller shall each bear the cost of fifty percent (50%) of any and all expenses incurred in connection with the liquidation or sale of the Terminated Membership Interest pursuant to this Section 10; provided however, each party shall bear the cost of its own attorneys' fees and accountants' fees.

10.4     **Limitation.**  Notwithstanding any provision in this Section 10 to the contrary, the LLC shall have no right to liquidate a Terminated Membership Interest and the Members shall have no right to purchase a Terminated Membership Interest if the Terminated Membership Interest will be transferred to a transferee approved or permitted under Section 8.1 above.  In such event, the transfer of the Terminated Membership Interest shall be subject to the terms and conditions set forth in Section 8.2 above.

10.5     **Loss of Voting Rights.**  Notwithstanding any other provision in this Agreement to the contrary, but subject to Section 10.5 above, those Members who are not a Terminated Party may elect, by a Majority of the Percentage Interests and by giving written notice thereof to the Terminated Party (or his legal representative, as the case may be), to cause the Terminated Party to have no further right to vote on LLC matters or otherwise participate in the LLC's business upon the occurrence of a Terminating Event, upon the occurrence of a Terminating Event.

11.      **Dissolution, Liquidation and Termination.**

11.1     **Events of Dissolution.**  The LLC shall dissolve upon the occurrence of any of the following events:

-17-

         **(a)**     The expiration of the LLC's term, as set forth in Section 2.5 above;

         **(b)**     The written consent of a Majority of Percentage Interests to dissolve the LLC;

         **(c)**     Sixty (60) days after the sale or other disposition of all or substantially all of the LLC's property, unless a Majority of Percentage Interests agrees in writing to continue the LLC's Business;

         **(d)**     Any event which makes it unlawful for the Members to carry on the LLC's Business;

         **(e)**     The decree of a court of competent jurisdiction;

         **(f)**     The revocation of any rights granted by the STP with regard to the approved pooling arrangements of the Members; or,

         **(g)**     Any changes to the Program which a majority of the Members deem contrary to the purposes of the LLC.

    **11.2**    <u>Winding-up</u>. Upon the LLC's dissolution, the LLC's business shall be wound up within a reasonable period of time, its assets liquidated, a final accounting made, and the LLC's books closed. The Members shall perform the winding up of the LLC's business and the liquidation of its assets.

    **11.3**    <u>Manner of Distribution</u>. Those proceeds which the LLC derives from the liquidation of its assets shall be applied and distributed in the following order of priority:

         **(a)**     First, to the payment of expenses of liquidation and LLC debts owing to creditors other than Members;

         **(b)**     Second, to the payment of any LLC debts owing to Members; and,

         **(c)**     Thereafter, to the Members in accordance with their positive Capital Account balances, after taking into account profit and loss allocations for the LLC taxable year during which liquidation occurs. Such liquidating distributions shall be made by the end of the LLC taxable year in which the LLC is liquidated or, if later, within ninety (90) days after the date of such liquidation.

    **11.4**    <u>Termination of LLC</u>. The LLC shall terminate upon: (i) the liquidation of the LLC's assets; and, (ii) the distribution of those proceeds which the LLC derives therefrom in accordance with this Section 11.

**12.**    <u>Dispute Resolution</u>.

    **12.1**    <u>Covered Disputes</u>. A "Covered Dispute" is any claim or dispute regarding: (i) this Agreement; (ii) the assets or liabilities of the LLC; (iii) the management and internal affairs of the LLC; or, (iv) any claim or dispute between (A) Members and (B) Members and the LLC with regard to any business or activities of the LLC.

-18-

**12.2**   Method of Arbitration.  All Covered Disputes shall be resolved by mediation or by arbitration.

(a)   Judicial Arbitration and Mediation Service.  The mediation and any arbitration shall be submitted to and settled by binding arbitration by Judicial Arbitration and Mediation Service ("JAMS") or a similar service acceptable to both parties if JAMS is not available.  The arbitration shall be conducted in accordance with California Code of Civil Procedure Sections 1280-1294.2;

(b)   Mediation.  Before the commencement of arbitration proceedings, the parties shall attempt in good faith to settle their dispute by mediation;

(c)   Arbitrator.  The arbitrator or arbitrators shall be selected from lists of arbitrators furnished by JAMS according to its rules;

(d)   Provisional Remedy.  The parties reserve the right to file with a court of competent jurisdiction an application for temporary or preliminary injunctive relief, writ of attachment, writ of possession, temporary protective order, and/or appointment of a receiver on the grounds that the arbitration award to which the applicant may be entitled may be rendered ineffectual in the absence of such relief;

(e)   Enforcement of Judgment.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof;

(f)   Discovery.  The parties may obtain discovery in aid of the arbitration to the fullest extent permitted under law, including California Code of Civil Procedure Section 1283.05.  All discovery disputes shall be resolved by the arbitrator;

(g)   Consolidation.  Any arbitration under this Agreement may be consolidated by JAMS with the arbitration of any other dispute arising out of, or relating to, the same subject matter when the arbitrator determines that there is a common issue of law or fact creating the possibility of conflicting rulings by more than one arbitrator or panel of arbitrators.  Any disputes over which arbitrator or panel of arbitrators shall hear any consolidated matter shall be resolved by JAMS;

(h)   Power and Authority of Arbitrator.  The arbitrator shall not have any power to alter, amend, modify, or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement or not available in a court of law;

(i)   Governing Law.  All questions in respect of procedure to be followed in conducting the arbitration as well as the enforceability of this Agreement to arbitrate which may be resolved by state law shall be resolved according to the law of the State of California and the rules of JAMS; and,

(j)   Costs.  The costs of the arbitration, including any JAMS administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration.

1878098.6

13.    <u>Amendments.</u>

13.1    <u>Authority to Amend.</u>  This Agreement is subject to amendment only with the written consent of all Members; provided, however, that this Agreement and the Articles may be amended by a Majority of Percentage Interests, except as provided in Section 13.2 below, in order to:

(a)    Admit additional Members, but only in accordance with, and if permitted by, the other terms of this Agreement;

(b)    Preserve the legal status of the LLC as a limited liability company under the Act or other applicable state or federal laws, if such does not change the substance of this Agreement and the LLC has obtained the written opinion of its counsel to that effect;

(c)    Cure any ambiguity, correct or supplement any provision in this Agreement which may be inconsistent with any other provision in this Agreement, clarify any provision of this Agreement, or make any other provisions with respect to matters or questions arising under this Agreement which will not be inconsistent with the provisions of this Agreement;

(d)    Satisfy the requirements of the Code and Regulations with respect to limited liability companies or of any federal or state securities laws or regulations, provided such amendment does not adversely affect the Percentage Interests of Members and is necessary or appropriate in the written opinion of counsel.  Any amendment under this subsection (d) shall be effective as of the date of this Agreement;

(e)    Satisfy any requirements of federal or state legislation or regulations, court order, or action of any governmental administrative agency with respect to the operation or ownership of the LLC; and,

(f)    Subject to the terms of Section 2.5, extend the term of the LLC.

13.2    <u>Restrictions on Amendments.</u>  Notwithstanding Section 13.1 above, the Members shall make:  (i) no amendment which would materially and adversely affect the federal income tax treatment to be afforded each Member; (ii) materially and adversely affect the Percentage Interests and liabilities of each Member as provided in this Agreement; (iii) materially change the purposes of the LLC; or, (iv) materially change the method of allocations and distributions as provided in Section 4 and Section 5, without the written consent of all of the Members.

13.3    <u>Amendments to Articles.</u>  In making any amendments to this Agreement, the Members shall prepare, execute, and file for recording such documents amending the Articles as required under the Act.

14.    <u>Pooling Activities.</u>

14.1    <u>Clean Trucks.</u>  The Members agree and acknowledge that one of the primary purposes of and for this Agreement is to provide a format whereby the Members may interact with each other to facilitate and maximize the opportunity to pool their clean truck

-20-

resources to maximize the utilization by such assets consistent with the goals of the CTP. Accordingly, the Members will undertake to develop programs to foster the inter-Member lease of vehicles consistent with applicable federal and state leasing laws and regulations. To this end, the Members will develop a clearing house structure to monitor clean truck equipment availability whereby any member may augment its own fleet of such vehicles with those of another Member who may on an as-needed basis. To the extent that any Member utilizes contracted owner operators/ independent contractors, the Members will arrange through appropriate subleases or other forms of leases to make such equipment available to another Member.

     **14.2**   **Joint Purchases and Services.** The Members agree that it would be beneficial to leverage the individual purchasing power of each Member on a group basis. The purchase through the LLC of maintenance equipment and materials, fuel, insurance and other related operational assets will help to reduce costs, improve efficiency and improve the quality, services and prices for customers. To this end, the Members expect to engage in cooperative information exchanges relative to clean trucks and the CTP.

     **14.3**   **Service Standards.** To enhance the pooling service, and as permissible by law, the Members may unanimously set operating standards, but not pricing, which will enhance the joint services anticipated through the joint efforts of the Members.

     **15.**   **Miscellaneous.**

     **15.1**   **Acknowledgment Regarding Legal Representation.** Legal counsel for Green Fleet, Hanson Bridgett LLP, has prepared this Agreement on behalf of Green Fleet. All other parties to this Agreement have retained, or have had the opportunity to retain, separate counsel to: (i) help them in evaluating this Agreement; (ii) assist them in determining whether the provisions contained in this Agreement are in their best interests and consistent with their objectives; and, (iii) advise them regarding their positions in the LLC from an economic, legal and tax standpoint.

     **15.2**   **Binding Effect.** Subject to the restrictions set forth in this Agreement, this Agreement shall be binding upon the parties to this Agreement and their successors, assigns, and representatives.

     **15.3**   **Captions and Headings.** Captions and headings used in this Agreement are for convenience purposes only. As such, they shall not control, affect, modify, amend, or change the meaning or construction of any term or provision contained in this Agreement.

     **15.4**   **Counterparts and Facsimiles.** The Members may execute this Agreement simultaneously, in any number of counterparts, or on facsimile copies, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

     **15.5**   **Cumulative Remedies.** The remedies set forth in this Agreement shall be cumulative to the extent permitted by law and in addition to any and all other remedies available at law, in equity or otherwise, they may be exercised partially, concurrently, or separately. The exercise of one remedy shall not be deemed to preclude the exercise of any other remedy.

1878098.6

15.6    **Entire Agreement.** This Agreement contains the Members' entire agreement and supersedes any prior oral or written agreements between them with respect to the subject matter contained in this Agreement.  There are no representations, agreements, arrangements, or understandings (oral or written) between the Members relating to the subject matter of this Agreement which are not fully expressed in this Agreement.

15.7    **Further Documents.** Each party to this Agreement agrees to execute, with acknowledgment and affidavit if required, any and all documents in writing which may be required under this Agreement or reasonably requested by another party to this Agreement in connection with the transactions contemplated in this Agreement.

15.8    **General Interpretation.** The terms of this Agreement have been negotiated by the parties to this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the parties to this Agreement to express their mutual intent.  This Agreement shall be construed without regard to any presumption or rule requiring construction:  (i) against the party causing all or any part of such instrument to be drafted; or, (ii) in favor of the party receiving a particular benefit under the Agreement.  No rule of strict construction will be applied against any party to this Agreement.

15.9    **Governing Law.** This Agreement, together with the parties' respective rights and obligations under this Agreement, shall be governed by and construed in accordance with the laws of the State of California.

15.10   **Jurisdiction.** Each party to this Agreement consents to be subject to the exclusive jurisdiction of the California courts as to any matter arising under, or pertaining to, this Agreement.

15.11   **Notices.** Any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given upon:  (i) personal delivery; (ii) twenty-four (24) hours after deposit with United Parcel Service or a comparable express courier, addressed to a party at the address set forth below his signature to this Agreement; or, (iii) forty-eight (48) hours after deposit in the United States mail, by certified mail, return receipt requested, postage prepaid, addressed to a Member at the address set forth below the Member's signature to this Agreement.  A Member may designate another address for notice purposes upon written notice thereof to the other Members.  The LLC's address for such notice purposes shall be the address of its principal place of business.

15.12   **Pronouns and Gender.** Any pronouns or references used in this Agreement shall be deemed to include the masculine, feminine, or neuter gender, as appropriate.  Any expression in the singular or plural in this Agreement shall, if and to the extent appropriate in the context, include both the singular and the plural.

15.13   **Recitals and Exhibits.** All recitals set forth above in this Agreement are true and correct and are incorporated into this Agreement by this reference.  All exhibits referenced in this Agreement and attached to this Agreement are incorporated into this Agreement by this reference.

15.14   **Severability.** If a court of competent jurisdiction finds any provision in this Agreement to be invalid, such invalidity shall not affect the remainder of the Agreement.  In such event, (i) the invalid provision shall be deemed severed from the Agreement, and (ii) the

remainder of the Agreement shall remain enforceable in accordance with its terms and of full force and effect.

**15.15** **Third Parties - No Interest.** Nothing in this Agreement (whether express or implied) is intended to or shall: (i) confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to this Agreement and their respective successors and assigns; (ii) relieve or discharge the obligation or liability of any third person to any party to this Agreement; or, (iii) give any third person any right of subrogation or action against any party to this Agreement.

**15.16** **Time of Essence.** Time is of the essence of this Agreement and all terms, covenants, conditions and provisions set forth in this Agreement.

**15.17** **Waiver.** A party's waiver of any breach of any provision contained in this Agreement shall not constitute a continuing waiver or a waiver of any subsequent breach of such provision or any other provision contained in this Agreement.

**15.18** **Representation.** The Members acknowledge that pursuant to the request of each Member, the law firm of Hanson Bridgett undertook to form the LLC and to draft this Agreement. The Members also acknowledge that Hanson Bridgett is also counsel to and for Member Green Fleet Systems, LLC. Each member has entered into a Joint Representation Agreement with Hanson Bridgett which includes a waiver of conflict as to any of the services provided by Hanson Bridgett with respect to the LLC. Each Member has counsel of their own choosing and was free to consult with such resource when and as they determined.

MEMBERS

GREEN FLEET SYSTEMS, LLC, a Delaware limited liability company

By: MOONEY ENTERPRISES, INC., a Delaware corporation, its Managing Member

By: _____
GARY MOONEY, President

Address:
19550 ALAMEDA STREET
RANCHO DOMINGUEZ, CA 90221

*[signatures continue on the following page]*

1878098.6

CALIFORNIA INTERMODAL ASSOCIATES,
INC., a California corporation

By: _____
     GAbriel CHAul, its President

Address:
6666 WASHingTon Blvd.
Commerce, CA- 90040


FOX TRANSPORTATION, INC., a California
corporation

By: _____
     _____, its _____

Address:
_____
_____


GOLDEN STATE EXPRESS,
INCORPORATED, a California corporation

By: _____
     FrEdRick Jobing, its PresidenT

Address:
_____
_____


HARBOR DIVISION, INC., a California
corporation

By: _____
     HARBOR DIVISION, its PRESSIDENT

Address:
P.O. Box 610
WILMINGTON, CA,


*[signatures continue on the following page]*


-24-

**OVERSEAS FREIGHT, INC.,** a California
corporation;

By: _Joseph Wang_, its _CFO_

Address: _____
_____
_____


**PACIFIC 9 TRANSPORTATION, INC.,** a
California corporation

By: _CHRIS HONG_
, its _____

Address: _____
_____


**PROGRESSIVE TRANSPORTATION
SERVICES, INC.,** a California corporation

By: _Kevin L. Dukesherer_
_KEVIN DUKESHERER_, its _DIRECTOR_

Address: _____
_____


**SOUTHERN COUNTIES EXPRESS, INC.,** a
California corporation

By: _Brian Grely_, its _President_

Address: _____
_____


*[signatures continue on the following page]*

1878098 6

TOTAL TRANSPORTATION SERVICES, INC.,
a California corporation

By: _Albert Frazier_____

‾‾Albert Frazier‾‾ , its ‾‾CEO‾‾

Address:

_____

_____

-26-

1878098 6

# EXHIBIT 2

BEFORE THE
SURFACE TRANSPORTATION BOARD



DOCKET NO. MC -MCF 21034

POOLING APPLICATION
FILED PURSUANT TO
49 U.S.C. SECTION 14302

CLEAN TRUCK COALITION, LLC

William D. Taylor, Esq.
Wendy Tauriainen, Esq.
HANSON BRIDGETT LLP
500 Capitol Mall, Suite 1500
Sacramento, CA 95814
Phone: (916) 442-3333
Fax:    (916) 442-2348

James A. Calderwood, Esq.
Zuckert, Scoutt & Rasenberger, L.L.P.
888 Seventeenth St. N.W., Suite 700
Washington, D.C. 20006
Phone: (202) 298-8660
Fax:    (202) 342-0683

Attorneys for Applicants

Dated:  June 3, 2009

1878798.9



BEFORE THE
SURFACE TRANSPORTATION BOARD

---

DOCKET NO. MC-_____

---

POOLING APPLICATION
FILED PURSUANT TO
49 U.S.C. SECTION 14302

CLEAN TRUCK COALITION, LLC

This Pooling Application ("**Application**") is filed pursuant to 49 U.S.C. Section 14302. It seeks approval by the Surface Transportation Board ("**the Board**") of the proposed joint venture operating agreement ("**Operating Agreement**" or "**Pooling Agreement**") between the participating motor carriers to engage in a pooling of certain traffic, services, equipment, and operations as described herein. The Operating Agreement is appended hereto as Appendix 1[1]. The proposed effective date of the pooling arrangement is August 1, 2009. In accordance with the requirements of 49 C.F.R. Part 1184, *Motor Carrier Pooling Operations* ("**Part 1184**"), applicants respectfully submit the following:

---

[1]   The Operating Agreement relates to the formation by the subject motor carriers of Clean Truck Coalition, LLC, a California limited liability company, as the corporate methodology to effectuate their joint enterprise.

1.

1878798.9

I.

## IDENTIFICATION OF ALL CARRIERS PARTY
## TO THE JOINT VENTURE OPERATING AGREEMENT
## (49 C.F.R. PART 1184.2(a))

The motor carrier parties to the pooling arrangement include:  (i) Green Fleet Systems, LLC, a Delaware limited liability company; (ii) **California Intermodal Associates, Inc.,** a California corporation; (iii) **Fox Transportation, Inc.,** a California corporation; (iv) **Golden State Express, Incorporated,** a California corporation; (v) **Harbor Division, Inc.,** a California corporation; (vi) **Overseas Freight Inc.,** a California corporation; (vii) **Pacific 9 Transportation, Inc.,** a California corporation; (viii) **Progressive Transportation Services, Inc.,** a California corporation; (ix) **Southern Counties Express, Inc.,** a California corporation; and, (x) **Total Transportation Services, Inc.,** a California corporation (hereinafter sometimes collectively referred to as **"applicants," "members,"** or **"participating motor carriers"**). Each motor carrier is a member of the Clean Truck Coalition, LLC, a California limited liability company ("CTC"), and as such, is a party and subject to the terms and conditions of the Operating Agreement attached hereto.  For purposes of this Application, the term "clean truck" or "clean trucks" shall refer to a motor vehicle tractor that is equipped with a 2007 or newer diesel engine or an engine powered by alternative fuel such as liquefied natural gas ("LNG"), compressed natural gas ("CNG"), or a hybrid electric/diesel system, and which is compatible with the protocols of the Clean Truck Program described below.

II.

## GENERAL DESCRIPTION OF THE TRANSACTIONS
## (49 C.F.R. PART 1184.2(b))

Each of the participating motor carriers generally conducts regional transportation operations with a specialized interest as duly licensed, registered, and

2.

1878798.9

qualified companies to serve the Ports of Los Angeles and Long Beach (collectively, "Ports" and individually, "Port") as part of a comprehensive Clean Truck Program ("Program") to operate vehicles to and from these facilities.  The Program is an environmental program aimed at reducing air pollution caused by the trucks used to transport cargo to and from each Port facility.[2]

Generally, the participating motor carriers pick up or deliver containers at and to facilities of each Port.  The containers have had a prior movement, often in interstate commerce by rail and motor or, internationally, by ocean carrier.  The overall delivery territory varies by each participating motor carrier, depending on customer requirements, container stationing and warehouse locales throughout Southern California and beyond.  As such, each motor carrier is a participant in the Program through the overarching San Pedro Bay Ports Clean Air Action Plan ("Clean Air Action Plan").[3]

The applicants are duly qualified to meet and satisfy stringent clean truck requirements in connection with their access to and from the Ports of Los Angeles and Long Beach as part of a comprehensive strategy to dramatically cut air pollution, reduce health risks associated with air pollution and mitigate traffic for a global seaport complex. The Clean Air Action Plan seeks to develop and implement:

- A truck replacement program which will phase out all "dirty" diesel trucks from the Ports within five (5) years;

---

[2]  The Clean Air Action Plan was implemented by the Board of Harbor Commissioners, City of Los Angeles, at a meeting held on October 23, 2008, pursuant to Order No. 08-6973, amending Tariff Circular No. 36 to Port of Los Angeles Tariff No. 4.  Likewise, the Port of Long Beach took similar action after it added Rule 34-J, Section 10, Clean Air Action Plan, to Port of Long Beach Tariff No. 004.  Information on the Clean Trucks Program is available at the Ports' websites, http://www.polb.com/cleantrucks and http://www.portoflosangeles.org/cleantrucks.

[3]  By way of explanation, it is estimated that approximately forty percent (40%) of the United States' import and export container traffic flows through the Ports of Los Angeles and Long Beach, making them critical components of the nation's economy.  Containers unloaded and loaded at the Ports are transported, or drayed, by trucks to and from off-port terminals, rail yards, and other locations outside of the Ports at the expense of the cargo's owners.  Overall, these drayage operations are critical to the Ports' operations and functions and involve thousands of trucks and drivers.  The participating motor carriers are part of the drayage carrier community.

3.

- Replacement of "dirty" diesel trucks with a new generation of clean or retrofitted vehicles;

- Aggressive milestones with measurable goals for air quality improvements;

- Recommendations to eliminate emissions of ultra-fine particulates; and,

- A technology advancement program to reduce greenhouse gases.

The Program is a strategic part of the Clean Air Action Plan and is designed to provide grants and financial incentives that allow selected trucking companies to replace older, high-polluting trucks with newer, cleaner trucks. The Program also aims at creating a more consolidated network of so-called "Concessionaires" who can be held accountable for performing regular maintenance on trucks in a manner that helps ensure lower emissions output over the life of the truck.[4]

The Clean Air Action Plan represents an investment by the Port of Los Angeles and the Port of Long Beach of hundreds of millions of dollars. A portion of that investment has been channeled to the Program. Within the Program, the applicants collectively represent less than ten percent (10%) of the overall monthly truck activity to and from Long Beach and Los Angeles harbor facilities. By volume of monthly container activities to and from the Ports, each carrier represents:

---

[4]   In the latest "preemption case" involving the Program, entitled American Trucking Associations, Inc. v. The City of Los Angeles, et al., CV08-04920 CAS (TX) ___ F.Supp. 3d ___ (2009), 2009 U.S. Dist LEXIS 40656, Judge Christina Snyder issued an injunction against the enforceability of certain portions of the standard Concession Agreement as preempted under the Federal Aviation Administration Authorization Act, 49 U.S.C. Section 145019(c)(2)(A). However, the scope of the injunction did not include that portion of the Clean Trucks Program related to clean trucks and the vehicle replacement aspects thereof as described herein. See also, American Trucking Associations, Inc. v. City of Los Angeles, 557 F. Supp. 2d 1110 (C.D. Cal. 2008), 2008 U.S. Dist. LEXIS 99691. rev. and amended by American Trucking Associations, Inc. v. City of Los Angeles, 559 F. 3d 1046 (2009), U.S. App. LEXIS 5827 (9th Cir. Cal. 2009), the predecessor cases to Judge Snyder's latest decision on the subject of the Program.

4.

| Carrier | Monthly # of Containers |
|---|---|
| C.I.A. | 900 |
| Fox | 3,780 |
| GSL | 1,300 |
| Green Fleet | 3,240 |
| Harbor Division | 540 |
| Overseas | 2,800 |
| Pac 9 | 7,700 |
| Progressive | 3,360 |
| Southern Counties | 6,750 |
| TTSI | 6,480 |
| TOTAL | 36,850 |

This cumulative number is miniscule when compared to the total container activity at either Port. Each Port provides overall yearly and monthly activity which is available at the website referred to in footnote 5 below.[5]

The participating carriers are regarded as small- to mid-sized companies. Individually, they use either employee drivers or independent contractors (under comprehensive lease contracts geared to the Program) to operate their own vehicles, including those clean trucks as defined herein, acquired by each applicant under the Clean Air Action Plan. Each participating carrier has been certified under the Program as a Licensed Motor Carrier ("LMC").

---

[5]  See www.portoflosangeles.org/stats/stats_2009/2009km; and, www.polb.com/economics/stats/teus_archive.asp.

5.

1678798.9

The Program is a critical component of the Clean Air Action Plan in establishing a critical mass of clean alternative fuel drayage trucks serving each Port. The Program promotes the purchase, fueling and maintenance of on-road clean heavy duty trucks as a means of reducing air pollution on a very aggressive timeline. Each applicant operates clean trucks through the Program thereby providing a common operating symmetry which naturally leads to this proposal to use the specialized equipment on a shared basis to better maximize the overall short- and long-term goals of the Clean Air Action Plan. In this regard, both Ports have adopted "rolling truck bans" under which certain older trucks are gradually prohibited from providing drayage services at each respective Port.[6] As a result, the expanded opportunity for each applicant to use the other applicants' clean trucks becomes more critical as these standards are implemented by each Port.

To further achieve the Program's goals, each Port has imposed on cargo owners a Clean Truck Fee of Thirty-Five Dollars ($35.00) for each loaded 20-foot container transported to a Port by a dirty truck. The fee for a 40-foot container is Seventy Dollars ($70.00). The Ports intend to use the money raised by these fees, along with other state and local government subsidies, to fund a program to support the replacement of older vehicles. Each of the participating motor carriers has purchased clean trucks for the Program and are parties to related Concession Agreements with each Port.

Through the proposed pooling operation, and without interrupting their own carrier services, the motor carrier participants will establish an area network of service providers consisting of a class of strong and reliable asset-based regional operators within the context of their own clean truck programs. These motor carrier participants share as a common denominator amongst them their status as specially qualified and

---

[6]   Beginning with a ban on pre-1989 trucks that commenced October 1, 2008 and culminating January 1, 2012 with a ban on all trucks that do not meet Environmental Protection Agency 2007 Truck Emission Standards.

6.

licensed entities which serve the particular market area utilizing the clean truck resources on a collaborative basis.

Accomplishing these joint goals and efficiencies will require the coordination and combination of the applicants' information technology, operations, leased equipment, vendor contacts and resources, maintenance facilities, vehicles and related administration. This structure, likewise, will require the development of an internal and external communication and joint management plan; the training of representatives to best maximize this opportunity; and, the implementation of ways to cross-sell and promote each others' services as licensed operators with access to the Ports.

The participating motor carriers anticipate that their joint efforts will facilitate the most efficient allocation and utilization of their specialized clean truck equipment between them, allowing for better operating efficiency and operation of the vehicles without the need to add new equipment, thereby economically enhancing the common goals and purposes of the Port of Los Angeles and the Port of Long Beach and reducing the health risks to the local population and the environment.

Through the proposed form of Operating Agreement, the applicants have developed, and seek to achieve, a coordinated network of information to better utilize shared technology for tracking clean fuel vehicles; coordinate internal invoicing on vehicle leases between them; and, jointly purchase necessary equipment and materials on a group basis, increasing leverage to obtain better maintenance equipment and services at a lower cost that would not otherwise be available to a single operator.

Each of the applicants has been selected and qualified as a Concessionaire for purposes of participating in the Program. As a group, they share the unique qualifications necessary for operating clean trucks consistent with the goals of the Program. Individually, the applicants have made a significant investment in clean trucks through the purchase of over six hundred (600) of such units using their own funds. One

1878798.9

of the purposes of the Pooling Agreement is to provide a mechanism whereby each member of the LLC has access to the inventory of these vehicles on a continuous basis. The clean trucks purchased by the applicants include vehicles powered by alternative fuels such as LNG, as well as vehicles powered with the 2007 diesel engine technology (the most up-to-date clean-burning diesel technology available). Because the applicants are committed to the goals of the Clean Air Action Plan, they would welcome the opportunity to augment their fleets with additional clean trucks, but are currently financially unable to do so. Instead, they intend to create a clean truck clearinghouse between them to monitor trucks available so that a member may have access to such equipment when its own fleet is otherwise committed to existing shipments. The trucking suppliers of clean truck vehicles assure that there is a consistent use of the equipment to promote the goals of the Program.

   The best alternative is for the applicants to be able to pool their clean trucks. In this way, the applicants can maximize the utility of the clean trucks they already own. Each trip made by a clean truck that would otherwise have been idle without the pooling arrangement, represents a trip not made by a "dirty" truck and a further reduction in particulate emissions pursuant to the goals of the Clean Air Action Plan. Together, the participating carriers currently represent a fleet of 626 new clean trucks, allocated between them as follows:

8.

| Carrier | Clean Trucks |
|---|---|
| C.I.A. | 15 |
| Fox | 70 |
| GSL | 15 |
| Green Fleet | 60 |
| Harbor Division | 10 |
| Overseas | 40 |
| Pac 9 | 110 |
| Progressive | 61 |
| Southern Counties | 125 |
| TTSI | 120 |
| TOTAL | 626 |

Overall, there are approximately 5,000 clean trucks currently operating within the Ports.

Within the network established between them, the participating motor carriers will have the means to offer better and more coordinated transportation services to their customers from and to these critical service points, with the goal of offering service superior to that which may be achieved through the typical interline counterparts.

### III.

### STANDARDS FOR REVIEW

In accordance with 49 U.S.C. § 14302(c)(2), when a pooling application is made, the Board undertakes to make a determination as to "whether the agreement or combination is of major transportation importance and whether there is substantial likelihood that the agreement or combination will unduly restrain competition." If it is

9.

determined that neither of these two factors exists, then the Board may approve and authorize the agreement without a hearing.  49 C.F.R. § 1184.3.

The statutory standards for approval are that the agreement: "(1) will be in the interest of better service to the public or of economy of operation; and, (2) will not unreasonably restrain competition".  49 U.S.C. § 14302(b).  See ICC Ex. Parte No. MC-141, Policy Statement on Motor Carrier Pooling Application, 127 MCC 746 (decided March 30, 1981).

IV.

SPECIFIC DESCRIPTION OF THE
OPERATING AUTHORITIES SOUGHT TO BE POOLED
(49 C.F.R. PART 1184.2(c))

To achieve their joint plan, the participating motor carriers will rely on the commonality of their current U.S. Department of Transportation (DOT) registrations under 49 U.S.C. Sections 13901, 13902.  Each has been and must continually remain duly qualified and certified as Concessionaires by the ports of Los Angeles and Long Beach to be part of the far-reaching Clean Air Action Plan to reduce particulate matter emissions from all sources associated with the transportation functions carried on at the Ports, while mandating the use of alternative fuel services.  Together, both requirements create a common operating focus.

The involved operating registrations for each applicant are identified in Appendix 1 hereto.  By virtue of these registrations, each applicant is authorized to transport general commodities throughout the United States.  Within the scope of their origin Los Angeles and Long Beach port operations, the applicants propose to augment their present service from a separate to a joint regionalized service to most efficiently use and operate their special equipment between them, without abandoning their own individual services.  The Plan will be an extension of such services.

10.

V.

### BASIS AND STRUCTURE AS
### A GENUINE POOLING ARRANGEMENT
### (49 C.F.R. PART 1184.2(d))

To achieve their common operating goals and efficiencies, the participating motor carriers will depend on each other to pool and/or divide specialized clean truck equipment and corresponding traffic, as necessary, to conduct the contemplated joint operations, with a specific emphasis on exchanging vehicles to fill traffic lanes, including a lease arrangement between them to distribute these specialized vehicles to cover loads to and from the Port facilities. Likewise, the participating motor carriers will use collective purchasing options for fuel, equipment, and materials to better manage costs of operations through a central buying mechanism established among and available to the applicants.

In order to provide a structure to best facilitate and manage their joint efforts, the participating motor carriers will proceed to formalize CTC. Each carrier is a member of CTC, with an equal ownership interest in this entity. In effect, CTC will operate as a joint venture within a limited liability company structure.

Having formed CTC, the applicants, in turn, have agreed to manage their respective interests therein through an Operating Agreement, a copy of which is attached hereto as Appendix 2. The terms of the Operating Agreement are largely typical of such limited liability company arrangements and serve to solidify the joint operating and lease commitments between the applicants to implement and manage the enterprise, as LMC carriers, collectively extending to each other the continuous availability to access and use each other's specialized equipment clean truck assets.

The arrangement between them creates a viable opportunity for the participating motor carriers to cross-sell and promote each other's services, to leverage clean truck equipment utilization, with or without drivers, and to maximize the significant investment

11.

1878798.9

necessary to qualify for and continue in the Program.  Overall, the Operating Agreement contemplates the implementation of a seamless transportation functionality within the relevant service area.

## VI.

### RELEVANT TRANSPORTATION MARKETS AFFECTED BY THE PROPOSED POOLING ARRANGEMENTS (49 C.F.R. PART 1184.2(e))

The Clean Air Action Plan necessarily defines the relevant market:  shipments transported to and from the Ports of Los Angeles and Long Beach using clean trucks. The outbound deliveries will generally be to designated rail and truck container yards, nearby distribution facilities, and other regional service points.  Inbound shipments will represent traffic moving in the reverse direction.

The participating motor carriers will continue to conduct their own transportation operations.  Essentially, each will continue to serve the Ports of Los Angeles and Long Beach in the most efficient and economical manner, consistent with established custom and practice.  By sharing freight and equipment opportunities among them to enhance these operations, the participating motor carriers expect to expand their own equipment utilization, load factors, operating efficiencies, and related revenue within this market area, particularly when circumstances prevent or compel direct service by one or more of the applicants.

## VII.

### THE COMPETITIVE ROUTING AND SERVICE ALTERNATIVES REMAINING IF THE POOLING AGREEMENT IS APPROVED (49 C.F.R. PART 1184.2(f))

To the extent that each applicant may operate vehicles not otherwise qualified as clean trucks in the course of their own operations, each participating motor carrier will

1878798.9

continue existing interchange arrangements with other carriers as to traffic moving on such regular, "non-clean" diesel tractors. Only the clean fuel vehicles are subject to this pooling application. Their individual qualification as LMCs in accordance with the Program and the Clean Air Action Plan creates a necessary operating distribution as a function of the Program. By necessity, this portion of the applicants' operations are particular to the Program and do not affect the existing routing and service alternatives offered by carriers using standard diesel tractors. The applicants' clean trucks represent a small percentage of the available routing and service alternatives. The applicants' participation in the proposed pooling arrangement will have a negligible, if any, effect on the competitive alternatives.[7] In fact, there are several major trucking companies who are also LMCs and provide similar services as the Applicants. To that extent, the joint arrangements of the members will help to meet the competition of the larger carriers.

## VIII.

### AN ESTIMATE OF THE PUBLIC BENEFITS THAT WILL ACCRUE FROM APPROVAL OF THE PROPOSED AGREEMENT (49 C.F.R. PART 1184.2(g))

The Clean Air Action Plan is an example of a significant investment in public policy designed to protect the health of people and the environment in a critical metropolitan region. As integral stewards of the policy, the participating motor carriers have come together to find common ground to jointly support and enhance this investment. Approval of the proposed agreement will allow the applicants to maximize

---

[7] In Federal Maritime Commission v. City of Los Angeles, ___ F. Supp. 2d ___ (DC 2009), 2009 U.S. Dist. LEXIS 32403, Case No. 08-1895 (RJL) (D.D.C., April 15, 2009), the District Court denied a request by the FMC to enjoin portions of the Program. The FMC argued that the Program created two classes of carriers: those that qualified as a LMC, and those that did not. As a result, the FMC contended that the Program was anti-competitive. The Court rejected that position finding that access to the Program resulted in an "unconcentrated market." Likewise, the Court rejected the notion that LMCs could artificially raise prices and rates for services. Overall, the Court found that the Program did not "harm competition in the drayage market" as between LMC and non-LMC carriers and, moreover, as between the population of LMC drayage companies.

1878798.9

their participation in the Program by lowering the cost barriers to such participation. For example, the ability to jointly purchase materials and equipment specialized for clean trucks allows the applicants to leverage their collective buying power and frees the applicants' resources for further expansion of the overall Program. The more clean trucks the applicants can presently use and, ultimately, afford to operate, the fewer "non-clean" trucks will be needed to service the same transportation needs. Reduced combustion of diesel fuels, in turn, reduces emissions of particulates targeted by the Program and directly improves the health of the people and the environment in and around the Ports of Los Angeles and Long Beach. It would be difficult to estimate the public benefits arising from these proposed pooling arrangements, but they are obviously significant.

IX.

## EFFECT OF THE POOLING ARRANGEMENT
## ON PRESENT AND FUTURE COMPETITION
## (49 C.F.R. PART 1184(h))

One of the principal purposes of the pooling agreement is to facilitate seamless transportation utilizing a special class of vehicles amongst a diverse group of carriers admitted to the Program. It is the Clean Air Action Plan that defines the universe of eligible carriers and, ultimately, the competitive landscape. No large body of carriers could or would participate in the pooling agreement for the simple reason that inter-governmental action circumscribed the segment of the industry which is eligible to operate the clean vehicles. That determination is not the product of any overt action by the applicants. Instead, they undertook to apply for and become part of the Program. Having achieved that goal, among many other carriers, the applicants will take the opportunity one step further in order to provide a higher level of service to their

14.

customers who require continuous access to critical port facilities, and to create an environment in which to leverage the greatest use of clean vehicles.

Further, because the preponderance of clean trucks is currently owned by larger trucking companies, this pooling arrangement will allow the smaller and mid-sized applicants greater access to clean trucks. This improved access to clean truck technology will increase the ability of the smaller companies to compete with larger trucking operations and will ultimately further the goals of the Program and the Clean Air Action Plan. There are approximately 1,200 LMCs serving the Ports of which only ten (10) would be parties to this pooling arrangement. Some of the non-members are considerably larger than any of the ten (10) participating motor carriers. There are no significant barriers to entry into this market.

As already determined by the District Court in the FMC case, *supra*, (see fn. 7), given the foregoing, there can be no adverse competitive outcome from the pooling proposal.

## X.

### CERTIFICATION THAT RATES FOR POOLING OPERATIONS WOULD NOT VIOLATE THE RESTRICTIONS ON COLLECTIVE RULEMAKING (49 C.F.R. PART 1184.2(i))

It is hereby certified that the rates set for traffic and the joint assimilation of equipment under the agreement do not violate the restrictions on collective ratemaking contained in 49 U.S.C. Subtitle IV and Board regulations.

## XI.

### THE RELATIVE TRANSPORTATION IMPORTANCE OF THE POOLING AGREEMENT AS IT WOULD AFFECT THE PUBLIC AND THE NATIONAL TRANSPORTATION SYSTEM (49 C.F.R. PART 1184.2(j))

With the investment made by the Port of Los Angeles and the Port of Long Beach, it is only natural that those carriers with whom the Ports have associated to

15.

implement their environmental mandate come together to maximize the use of all available clean trucks between them. The Clean Air Action Plan is premised on a significant investment in mitigating pollution attributable to heavy vehicles. The applicants are an integral part of this movement.

The applicants' commitment to the goals of the Program as part of a new category of service creates a unique opportunity to economically and expeditiously support this local and national plan to the benefit of the public interest. Approval of the proposed pooling arrangement would allow the applicants to take full advantage of the opportunities to benefit public health offered by the Program. Maximizing the benefits to public health offered by the Program obviously increases the Program's success as measured by its goals and increases the likelihood that other segments of the national transportation system will follow suit to the greater enhancement of the public good.

XII.

NON-POOLING CARRIERS NOT
INCLUDED IN THE POOLING ARRANGEMENT
(49 C.F.R. PART 1184.2(k))

For the reason that the common denominator between the transportation motor carriers is their sanction from the Port of Los Angeles and the Port of Long Beach under the Program, as opposed to so-called regular, commercial carriers using vehicles outside of the Program, the applicants are uniquely positioned to integrate a common service and equipment plan. There are currently in existence other similarly sanctioned carriers who are not part of the proposed pooling arrangement. Applicants are mindful that other similarly-situated Program-approved carriers could further enhance competition by streamlining the applicants' operations and the applicants are willing to consider, with approval by the Board, additional participants who are also qualified and meet the criteria of the Operating Agreement.

16.

1878798.9

As the pooling operation gets underway, the applicants, consistent with the principles of competition, and as permitted by the Board as well as the mandates of the Program, are willing to include suitable, authorized and qualified nonpool carriers capable of providing the services and conducting the operations necessary to meet the common operating criteria they have established between themselves.

XIII.

## POTENTIAL ENERGY AND ENVIRONMENTAL EFFECTS OF THE PROPOSED POOLING ARRANGEMENTS
### (49 C.F.R. PART 1184.2(l))

It is a safe assumption that the implementation of the proposed pooling agreement will have dramatic positive effects on the environment and with respect to energy usage. At present, the carriers have at their disposal specialized equipment to meet a legislative and service mandate, all of which is designed to meet major environmental prerogatives.

This application goes hand-in-hand with a major investment in safe and environmentally-sound transportation services. The success of the investment will result in dramatic improvements in environmental quality, particularly air quality, and a reduction in the particulate matter emissions. These improvements in environmental quality will beneficially impact public and environmental health.

In the end, the pooled regional operations will provide a more economic and efficient method of facilitating traffic to and from the principal service area on a much more integrated, seamless basis.

XIV.

## CERTIFICATION BY APPLICANTS
### (49 C.F.R. PART 1184.2(m))

I, William D. Taylor, counsel for applicants, do hereby certify that the representations made herein for pooling authority submitted on behalf of each of the

17.

named applicants are, to the best of my knowledge and belief, true and correct.

_____
William D. Taylor

## XV.

## CONCLUSION

For all of the foregoing reasons, applicants, jointly and severally, respectfully submit that the pooling agreement filed herewith will further the National Transportation Policy by enabling them to better leverage their investment in clean vehicles as part of the Program. Accordingly, it is requested that the Pooling Agreement be approved without a hearing.

Respectfully submitted,

_____
William D. Taylor, Esq.
Wendy Tauriainen, Esq.
Hanson Bridgett LLP

_____
James A. Calderwood, Esq.
Zuckert, Scoutt & Rasenberger, LLp

18.

1878798.8

APPENDICES

1.  Copies of the registrations ("authorities") of each carrier taken from the website of
    the Federal Motor Carrier Safety Administration

2.  Operating Agreement

3.  A caption summary for Federal Register publication

1878798.9

# EXHIBIT 3

40210
EB

SERVICE DATE – LATE RELEASE NOVEMBER 19, 2009

SURFACE TRANSPORTATION BOARD

DECISION

STB Docket No. MC-F-21034

CLEAN TRUCK COALITION, LLC—POOLING APPLICATION

Decided: November 19, 2009

By application filed on June 3, 2009, the Clean Truck Coalition, LLC (CTC), requests approval of a pooling agreement under 49 U.S.C. 14302 and 49 CFR Part 1184, to pool and/or divide specialized clean truck equipment[1] and corresponding traffic, as necessary, and to use collective purchasing options through a central buying mechanism for fuel, equipment, and materials to manage operation costs. Notice of the pooling application was published in the <u>Federal Register</u> on June 25, 2009 (74 FR 30356-57), inviting comments to be filed on or before July 27, 2009. Comments were filed by the International Brotherhood of Teamsters (IBT) and Ernesto Jesus Nevarez. This decision approves and authorizes CTC's pooling agreement.

BACKGROUND

CTC is a California limited liability company, comprised of motor carriers (members) that conduct regional interstate transportation operations and serve the Ports of Los Angeles and Long Beach (the Ports).[2] The members of CTC are regarded as small- to mid-sized companies that use either employee drivers or independent contractors to operate their own vehicles, including clean trucks. CTC states that its members have individually invested in clean trucks, having purchased 626 clean trucks in total. CTC also states that its members collectively represent less than 10 percent of the overall monthly clean truck activity (as measured by container moves) within the Ports' harbor facilities. Further, CTC states that its members satisfy the stringent clean truck requirements of the Ports and are duly licensed to serve both Ports as

---

[1] CTC defines "clean truck" as a motor vehicle tractor that is equipped with a 2007 or newer diesel engine or an engine powered by alternative fuel, such as liquefied natural gas, compressed natural gas, or a hybrid electric/diesel system, and compatible with the protocols of the Clean Truck Program described herein.

[2] The motor carrier parties to the pooling arrangement are: Green Fleet Systems, LLC, a Delaware limited liability company; California Intermodal Associates, Inc., a California corporation; Fox Transportation, Inc., a California corporation; Golden State Express, Incorporated, a California corporation; Harbor Division, Inc., a California corporation; Overseas Freight Inc., a California corporation; Pacific 9 Transportation, Inc., a California corporation; Progressive Transportation Services, Inc., a California corporation; Southern Counties Express, Inc., a California corporation; and Total Transportation Services, Inc., a California corporation.

STB Docket No. MC-F-21034

part of the Clean Truck Program (Program), an environmental initiative that seeks to reduce air pollution caused by trucks used to transport cargo to and from the Ports.[3] The Program, as described by CTC, aims to phase out all "dirty" diesel trucks from the Ports within 5 years through a rolling ban on all trucks that do not meet the Environmental Protection Agency 2007 Truck Emission Standards. To take part in the Program, carriers must apply to each Port for a concession agreement. These "concessionaires" are held accountable for maintaining their trucks to ensure lower emissions output over the life of the truck. The Program also provides grants and financial incentives that allow selected trucking companies to replace older, high-polluting trucks with newer, cleaner trucks.

CTC operates as a joint venture, through which members seek to establish a network of carriers that would pool and/or divide specialized clean truck equipment on a shared basis as part of the Program. In effect, the pooling agreement would create a "clean truck clearinghouse," whereby each member would have continuous access to an inventory of clean trucks and would be able to monitor the availability of clean trucks.

CTC states that this clearinghouse system would require the coordination and combination of members' information technology, operations, leased equipment, vendor contacts and resources, maintenance facilities, vehicles, and related administration. The structure would also require the development of an internal and external communication and joint management plan; the training of representatives; and the implementation of ways to cross-sell and promote each other's services as concessionaires with access to the Ports.

On July 24, 2009, Mr. Nevarez submitted comments, arguing that Federal Motor Carrier Safety Administration regulations governing the leasing of vehicles do not allow for the pooling or dividing of motor vehicles. Mr. Nevarez also states that leases, finance agreements, and regulations, both Federal and state, prohibit the subleasing or rental of vehicles used in the pooling agreement. Finally, Mr. Nevarez argues that, with its 626 clean trucks shared among 10 members, CTC members will restrain competition within the Program, which Mr. Nevarez states has over 6,000 registered clean trucks.

On July 27, 2009, IBT submitted comments, asserting that approval of the proposed pooling arrangement would have a disastrous impact on drivers operating in the Ports because CTC members would be able to coordinate and set prices both for what they charge and what they pay to drivers.[4] IBT states this would harm competition overall and would be particularly devastating for drivers who lease their equipment. IBT challenges CTC's market share characterization, arguing that CTC traffic accounts for more than 10 percent of clean truck

---

[3] The Clean Truck Program is part of the San Pedro Bay Ports Clean Air Action Plan, a comprehensive strategy adopted by the Ports to reduce port-related air pollution caused by trucks, ships, locomotives, and other equipment by at least 45 percent in 5 years.

[4] IBT comments on behalf of over 420 affiliated local unions. IBT also states that its "organizational activities include an effort to organize drivers working for Southern Counties Express, Inc.," a CTC member. CTC states that IBT's connection to CTC is tenuous.

STB Docket No. MC-F-21034

movements for the Port of Los Angeles, and that CTC carriers would be in a position to capture even more market share as more clean trucks enter the business; thus, its view is that CTC is positioned to dominate the market as customers switch to clean trucks.

CTC filed a reply to these comments on August 3, 2009. On October 2, 2009, CTC sent a letter to the Board members urging timely disposition of the pooling application. On November 11, 2009, CTC sent a letter to the Board's General Counsel expressing its belief that because the Board had not acted upon the pooling application by August 1, the proposed effective date listed in the application,[5] "by operation of law the application is now approved and effective and the member carriers may operate in accordance with the Application." CTC did not file either its October 2, 2009 letter or its November 11 letter with the Board or serve it on other parties to the proceeding. The Board has placed the letters in the public docket.[6]

## DISCUSSION AND CONCLUSIONS

Under 49 U.S.C. 14302(a), motor carriers providing transportation subject to the Board's jurisdiction may not pool or divide traffic, services, or any part of their earnings without the approval of the Board. The Board shall, after a hearing, approve and authorize a motor carrier pooling agreement to the extent it finds that the pooling or division of traffic, services, or earnings: (1) will be in the interest of better service to the public or of economy of operation; and (2) will not unreasonably restrain competition. 49 U.S.C. 14302(c)(3). However, the Board may approve motor carrier pooling agreements without the necessity of a hearing if it first determines that the pooling agreement is not of major transportation importance and that there is not a substantial likelihood that the agreement will unduly restrain competition. 49 U.S.C. 14302(c)(2). Here, the Board concludes that approval and authorization of the proposed pooling agreement is warranted without a hearing.

The Board takes all statutory timelines seriously and regrets that a decision could not be issued sooner in this case. However, contrary to CTC's statements in its November 11 letter, a motor carrier pooling agreement is not authorized unless and until the Board issues an order making the requisite findings and determinations under section 14302. Although the statute specifies that the Board should make its determinations under section 14302(c)(2) prior to the effective date of the pooling agreement, the statute does not provide that a Board failure to act by the effective date proposed by the applicants results in automatic approval.

---

[5] CTC has itself indicated two different effective dates: its application refers to a proposed effective date of August 1, 2009, while the pooling agreement states that it "shall be effective as of the date that the U.S. Surface Transportation Board approves the Agreement."

[6] We remind parties that failure to comply with the Board's rules at 49 CFR 1102 regarding filings and ex parte communications may result in sanctions. Under 49 CFR 1104.12, every document filed with the Board should include a certificate showing simultaneous service upon all parties in a proceeding.

STB Docket No. MC-F-21034

The Board finds that the proposed agreement is not of major transportation importance. The pooling agreement concerns only 10 carriers that collectively represent less than 10 percent of the overall monthly truck activity to and from both ports (less than 37,000 containers per month). As discussed below, should the pooling agreement be permitted, CTC's collective level of clean truck operations would be small in relation to the Ports' total number of clean truck movements. Nor would the agreement likely impact the services and routing provided by alternative services, namely standard diesel tractors (including the diesel tractor service provided by CTC members).

We also find that the proposed agreement would not unreasonably restrain competition. Rather, competition would be enhanced as the pooling agreement would give these smaller and mid-sized motor carriers greater access to clean trucks, thus enabling CTC members to compete with larger trucking operations, which CTC states make up the majority of clean truck owners. Further, CTC's clean truck market share appears relatively small. Based on figures submitted by IBT, only 5 CTC members appear in the list of "Top 20" clean truck cargo moves for the Port of Los Angeles, and these members' clean truck movements account for only 12% of the Port of Los Angeles' total clean truck moves in May 2009.[7] Given the efforts and goals of the Program, the number of carriers seeking concession agreements is likely to increase, resulting in more clean truck movements. Moreover, CTC has also indicated that, consistent with the principles of competition, it would consider including additional qualified carriers to the agreement, as permitted by the Board and the mandates of the Program.[8]

Neither IBT nor Mr. Nevarez has demonstrated that approval of CTC's pooling agreement would restrain competition.[9] Given that CTC's evidence indicates that CTC has only a relatively small market share of clean truck carriers serving the Ports and that evidence has not been refuted, we have no reason to conclude that CTC members would "dominate" the market

---

[7] CTC states and provides figures that indicate that six of its members' movements comprise 10% of the Port of Los Angeles' total clean truck moves for May 2009. However, it cites a traffic summary with only 5 CTC members appearing in the list of "Top 20" clean truck cargo moves for that port (see CTC Reply, Appendix 3). According to the traffic summary, and as asserted by IBT, the 5 CTC members appearing in the "Top 20" list constitute 12% of clean truck movements for the Port of Los Angeles. Whether CTC members account for 10 or 12 percent of clean truck movements for the Port of Los Angeles would not change our analysis of the relative size of CTC's market share.

[8] See Averitt Express, Inc., DATS Trucking, Inc., Lakeville Motor Express, Inc., Land Air Express of New England, Pitt Ohio Express, LLC, Canadian Freightways, and Epic Express—Pooling Agreement, STB Docket No. MC-F-21023, slip op. at 5 (STB served Jan. 31, 2008).

[9] Mr. Nevarez also cites several Federal and state regulations regarding leasing and rental requirements but fails to show how approval of the pooling agreement would conflict with these regulations. As CTC states in its reply, the leasing regulations would remain fully applicable to all agreements involving the lease and exchange of clean trucks between the members.

STB Docket No. MC-F-21034

and restrain competition.[10] Over 5,000 clean trucks operate between the Ports. As clean trucks are phased in to replace older trucks, in accordance with the aims of the Program, this figure could be expected to grow, increasing competition in a market with low entry barriers.[11] Thus, it is highly unlikely that the pooling agreement would allow CTC members to collude and engage in price fixing, as IBT asserts. Further, CTC certifies that the agreement does not violate the restrictions on collective ratemaking.

Given our findings on the transportation importance and competition, the Board can approve this pooling agreement without a hearing. But we also note that the pooling agreement serves the interest of better service to the public and of economy of operation. By our approving this pooling agreement, CTC members will be able to allocate efficiently their specialized clean truck equipment among themselves. Approval of the pooling agreement will enable members to form a coordinated network of information to track clean trucks; coordinate internal invoicing on leases between members; and jointly purchase equipment and materials on a group basis. In doing so, CTC will be able to provide more efficient service and clean trucks to the Ports and further the goals of the Program by reducing air pollution caused by truck traffic.

For the foregoing reasons, authority for CTC's pooling agreement will be granted. However, it is important for the parties to be aware that the Board retains the authority to withdraw authorization should it be shown that CTC members are engaging in activity that would unduly restrain competition. The Board will retain jurisdiction to require the submission of additional information should the Board find it necessary in the future. If the Board determines at any time that the transaction has become of major transportation importance or is likely to restrain competition unduly, the Board retains the power to suspend operation of all or part of the pool during the pendency of a public hearing concerning the criteria set forth in 49 U.S.C. 14302 and to impose such terms and conditions, if any, as are just and reasonable. Further, should circumstances materially change, any interested party may seek reconsideration or reopening of this decision by filing a petition with the Board.

---

[10] In the application, CTC points out that the Federal Maritime Commission (FMC), sought to enjoin parts of the Ports' program as anticompetitive, arguing that it would reduce competition in the drayage market by giving an edge to the class of carriers that qualified under the Program. But, in Federal Maritime Commission v. City of Los Angeles, 607 F.Supp 2d. 192, 200-01 (D.D.C. 2009), the District Court denied the motion for preliminary injunction, finding that the drayage market had low barriers to entry and that the Program resulted in an unconcentrated market under the Herfindahl-Hirschman Index (defined as the sum of the squares of the market shares, multiplied by 10,000, i.e., $\sum_{i=1}^{n} s_i^2 \times 10,000$, where $s_i$ is the market share of firm $i$ in the market, and $n$ is the number of firms). FMC has not asked us to deny this pooling agreement.

[11] Because the barriers to entry in the trucking industry are low, we find no basis in the record for IBT's suggestion that CTC members would capture an inordinate proportion of new clean trucks entering the market.

STB Docket No. MC-F-21034

    This decision will not significantly affect either the quality of the human environment or the conservation of energy resources.

    <u>It is ordered</u>:

    1.  The pooling agreement proposed in this application is approved and authorized.

    2.  The Board reserves the right to require submission of additional information, to investigate the actual operation of this pooling agreement, and to prescribe such terms and conditions as may be necessary to ensure compliance with the terms of this decision and applicable regulations.

    3.  This decision is effective on its date of service.

    By the Board, Chairman Elliott, Vice Chairman Nottingham, and Commissioner Mulvey.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Margaret M. Morrow and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## CV12- 8949 MMM (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

---

Ronald W. Novotny, SBN 89975
Robert R. Roginson, SBN 185286
Paul G. Szumiak, SBN 109982
Atkinson, Andelson, Loya, Ruud & Romo
12800 Center Court Drive South, Suite 300
Cerritos, CA  90703
Telephone:  (562) 653-3200
Facsimile:  (562) 653-3333

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLEAN TRUCK COALITION, LLC, a California Limited Liability Company; GREEN FLEET SYSTEMS, LLC, a Delaware limited liability company; OVERSEAS FREIGHT, INC., a California corporation; PACIFIC 9 TRANSPORTATION, INC., a California corporation; SOUTHERN COUNTIES EXPRESS, INC., a California corporation; and TOTAL TRANSPORTATION SERVICES, INC., a California corporation,<br><br>PLAINTIFF(S)<br><br>v.<br><br>JULIE SU, LABOR COMMISSIONER OF THE STATE OF CALIFORNIA, DEPARTMENT OF INDUSTRIAL RELATIONS, in her official capacity, and PAM HARRIS, DIRECTOR OF THE CALIFORNIA EMPLOYMENT DEVELOPMENT DEPARTMENT, in her official capacity,<br><br>DEFENDANT(S) | CASE NUMBER<br><br>CV12-08949 MMM(AJWx)<br><br><br><br>**SUMMONS** |

TO:   DEFENDANT(S):  JULIE SU, LABOR COMMISSIONER OF THE STATE OF CALIFORNIA, DEPARTMENT OF INDUSTRIAL RELATIONS

    A lawsuit has been filed against you.

    Within 60 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _____, whose address is _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

OCT 17 2012

Clerk, U.S. District Court

JULIE PRADO

Dated: _____     By: _____
                                                                Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11)                            **SUMMONS**

American LegalNet, Inc.
www.FormsWorkFlow.com

Ronald W. Novotny, SBN 92713
Robert R. Roginson, SBN 185286
Paul G. Szumiak, SBN 109982
Atkinson, Andelson, Loya, Ruud & Romo
12800 Center Court Drive South, Suite 300
Cerritos, CA  90703
Telephone:  (562) 653-3200
Facsimile:  (562) 653-3333

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLEAN TRUCK COALITION, LLC, a California Limited Liability Company; GREEN FLEET SYSTEMS, LLC, a Delaware limited liability company; OVERSEAS FREIGHT, INC., a California corporation; PACIFIC 9 TRANSPORTATION, INC., a California corporation; SOUTHERN COUNTIES EXPRESS, INC., a California corporation; and TOTAL TRANSPORTATION SERVICES, INC., a California corporation,<br><br>PLAINTIFF(S)<br><br>v.<br><br>JULIE SU, LABOR COMMISSIONER OF THE STATE OF CALIFORNIA, DEPARTMENT OF INDUSTRIAL RELATIONS, in her official capacity, and PAM HARRIS, DIRECTOR OF THE CALIFORNIA EMPLOYMENT DEVELOPMENT DEPARTMENT, in her official capacity,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV12-08949<br>MMM (AJWx)<br><br><br><br>**SUMMONS** |

TO:    DEFENDANT(S):  PAM HARRIS, DIRECTOR OF THE CALIFORNIA EMPLOYMENT DEVELOPMENT DEPARTMENT

    A lawsuit has been filed against you.

    Within  21  days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _____, whose address is _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

    OCT  17  2012

Clerk, U.S. District Court

**JULIE PRADO**

Dated: _____

By: _____
           Deputy Clerk

*(Seal of the Court)*

---

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

---

CV-01A (10/11)                                    SUMMONS

American LegalNet, Inc.
www.FormsWorkFlow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| CLEAN TRUCK COALITION, LLC, a California Limited Liability Company; GREEN FLEET SYSTEMS, LLC, a Delaware limited liability company; OVERSEAS FREIGHT, INC., a California corporation; PACIFIC 9 TRANSPORTATION, INC., a California corporation; SOUTHERN COUNTIES EXPRESS, INC., a California corporation; and TOTAL TRANSPORTATION SERVICES, INC., a California corporation, | JULIE SU, LABOR COMMISSIONER OF THE STATE OF CALIFORNIA, DEPARTMENT OF INDUSTRIAL RELATIONS, in her official capacity, and PAM HARRIS, DIRECTOR OF THE CALIFORNIA EMPLOYMENT DEVELOPMENT DEPARTMENT, in her official capacity |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Ronald W. Novotny, SBN 100041; Robert R. Roginson, SBN 185286 Paul G. Szumiak, SBN 109982 Atkinson, Andelson, Loya, Ruud & Romo 12800 Center Court Drive South, Suite 300, Cerritos, CA 90703 Telephone: (562) 653-3200; Facsimile: (562) 653-3333 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No    ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
49 U.S.C. § 10101 and 28 U.S.C. § 2201

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☒ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty ☐ 540 Mandamus/ Other | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/ PENALTY** | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | | | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 443 Housing/Acco- mmodations | | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities – Employment | ☐ 640 R.R.& Truck | ☐ 61 HIA(1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | | ☐ 446 American with Disabilities – Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | | | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | ☐ 440 Other Civil Rights | | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | | | **FEDERAL TAX SUITS** |
| | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus- Alien Detainee | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | | |

FOR OFFICE USE ONLY:    Case Number: CV12 08949

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

| CV-71 (05/08) | CIVIL COVER SHEET | Page 1 of 2 |

American LegalNet, Inc.
www.FormsWorkflow.com

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☒  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date _12/16/12_

Ronald W. Novotny

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com