1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22

| | |
|---|---|
| CLEAN TRUCK COALITION, LLC, a California limited Liability Company, et al., <br><br><br> Plaintiffs, <br><br> vs. <br><br> JULIE SU, LABOR COMMISSIONER OF THE STATE OF CALIFORNIA, DEPARTMENT OF INDUSTRIAL RELATIONS, in her official capacity, and PAM HARRIS, DIRECTOR OF THE CALIFORNIA EMPLOYMENT DEVELOPMENT DEPARTMENT, in her official capacity, <br><br> Defendants. | CASE NO. CV 12-08949 MMM (AJWx) <br><br> ORDER GRANTING DEFENDANT PAM HARRIS' MOTION TO DISMISS ACTION AND MOTION OF DEFENDANT JULIE SU TO DISMISS COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION (RULE 12(b)(1)) and FOR FAILURE TO STATE A CLAIM (RULE 12(b)(6)) |

23

24

25

26

27

28

On October 17, 2012, plaintiff Clean Truck Coalition, LLC and several of its members, plaintiffs Green Fleet Systems, LLC; Overseas Freight, Inc.; Pacific 9 Transportation, Inc.; Progressive Transportation Services, Inc.; Southern Counties Express, Inc.; and Total Transportation Services, Inc. (collectively, "plaintiffs") sued Julie Su, Labor Commissioner of the California Department of Industrial Relations, and Pam Harris, Director of the California

Employment Development Department.[1]  On December 26, 2012, Harris filed a motion to dismiss the action.[2]  On January 9, 2013, Su also filed a motion to dismiss.[3]  Plaintiffs oppose both motions.[4]

## I.  BACKGROUND

### A.    Facts Alleged In Plaintiffs' Complaint

The Clean Truck Coalition ("CTC") is a California limited liability company comprised of ten motor carriers that lease truck tractors, including clean trucks, and trailers, from independent motor carrier contractors that deliver goods to and from the Ports of Los Angeles and Long Beach, California.[5]  Pursuant to CTC members' lease agreements with the motor carrier contractors, the contractors are responsible for their own business expenses, including maintenance, repair, parking, and fuel expenses.[6]  CTC members compensate the contractors for freight hauling in accordance with negotiated rates and not by the payment of wages.[7]  The contractors allegedly enter into such leasing agreements with CTC members on a non-exclusive

---

[1]Complaint, Docket No. 1 (Oct. 17, 2012).

[2]Defendant Pam Harris' Motion to Dismiss Action ("Harris MTD"), Docket No. 9 (Dec. 26, 2012); Reply in Support of Defendant Pam Harris' Motion to Dismiss Action ("Harris MTD"), Docket No. 26 (Mar. 21, 2013).

[3]Motion of Defendant Julie Su to Dismiss Complaint for Lack of Subject Matter Jurisdiction (Rule 12(b)(1)) and for Failure to State a Claim (Rule 12(b)(6)) ("Su MTD"), Docket No. 12 (Jan. 9, 2013); see also Reply in Support of Motion to Dismiss Complaint ("Su Reply"), Docket No. 28 (Mar. 25, 2013).

[4]Opposition to Defendants' Motions to Dismiss Complaint ("Opp."), Docket No. 24 (Mar. 18, 2013).

[5]Complaint, ¶ 3; *id.*, ¶ 7.

[6]*Id.*, ¶ 7.

[7]*Id.*

basis.[8]  CTC members purportedly do not treat the contractors as employees for any purpose, including the payment of payroll taxes and withholding.[9]

Julie Su is the California Labor Commissioner; her office adjudicates wage claims under the California Labor Code.[10]  Pam Harris is the Director of the California Employment Development Department ("EDD"), which is responsible for assessing and collecting payroll taxes from employers for work performed by their employees in the state.[11]

In 2008, the Board of Harbor Commissioners of the City of Los Angeles and the Port of Long Beach adopted a "Clean Trucks Program" designed to replace pollution-generating trucks with newer ones that would emit fewer particulates.[12]  To meet the Program's requirements, CTC members allegedly purchased more than six hundred "clean trucks."[13]  Because their need for trucks allegedly varies depending on the number of shipments they have to deliver or pick up from the Ports at any given time, CTC members agreed to enter into a collective "pooling arrangement" that would allow them to utilize each other's clean trucks subject to independent motor carrier contractor leases.[14]

Under 49 U.S.C. § 14302, the Surface Transportation Board ("STB"), a sub-agency within the U.S. Department of Transportation, can approve and authorize such pooling agreements. Section 14302 states that a carrier participating in an approved pooling agreement "is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the arrangement." *Id.*, § 14302(f).  CTC sought and obtained the STB's

_____

[8]*Id.*

[9]*Id.*

[10]*Id.*, ¶ 5.

[11]*Id.*, ¶ 6.

[12]*Id.*, ¶ 8.

[13]*Id.*, ¶ 9.

[14]*Id.*

approval of its members' pooling agreement on November 19, 2009.[15]

Following the STB's approval of the pooling arrangement, defendants allegedly investigated the operations of certain CTC members "for the ostensible purpose of determining whether or not the independent motor carrier contractors with whom each contracts to haul freight under the pooling arrangement should be reclassified and treated as employees under California law."[16]  Plaintiffs allege that the investigations have taken the form of audits conducted by the EDD to determine whether the motor carrier contractors are employees or independent contractors for payroll tax withholding purposes.[17]  The Labor Commissioner has also allegedly conducted investigations to determine whether the motor carrier contractors should be considered employees entitled to overtime pay, meal breaks, rest breaks, "waiting time" penalties, and reimbursement of business expenses under California law.[18]  The Labor Commissioner has purportedly processed claims filed by independent motor carrier contractors against CTC members for reimbursement of expenses.[19]  Plaintiffs contend that defendants' investigations and adjudications of contractor claims threaten to interfere with the pooling arrangement approved by the STB.[20]  They also assert that both Su and Harris have "adopted an unwritten policy of determining that independent motor carrier contractors who lease their trucks from carriers . . . are automatically considered employees" rather than independent contractors.[21]  Plaintiffs allege that treating the contractors as employees entitled to protection under California labor and employment law will prevent implementation of CTC's pooling agreement under § 14302.

---

[15]*Id.*, ¶ 13.

[16]*Id.*, ¶ 14.

[17]*Id.*

[18]*Id.*

[19]*Id.*

[20]*Id.*

[21]*Id.*, ¶ 15.

They seek a declaration that CTC members are exempt from defendants' "unwritten policy," and that the motor contractor carriers are independent contractors rather than employees of CTC's members.[22] Plaintiffs also seek injunctive relief preventing the state from investigating, auditing, or processing any claim that the motor contractor carriers are employees. Finally, plaintiffs seek a declaration that two state laws, California Labor Code §§ 226.7 and 512 are preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501.

### B. Plaintiffs' Request for Judicial Notice

In support of their opposition to defendants' motions to dismiss, plaintiffs ask that the court take judicial notice of eight documents:[23] (1) a notice of assessment against plaintiff Pacific 9 Transportation Co., Inc., issued by the EDD on July 31, 2012;[24] (2) notices of claims filed with the Labor Commissioner on December 7, 2012, against Pacific 9 Transportation Co., Inc.;[25] (3) a notice of claim filed with the Labor Commissioner on May 1, 2012 against plaintiff Overseas Freight, Inc;[26] (4) a records subpoena issued by the Labor Commissioner to plaintiff Green Fleet System, Inc., on January 12, 2012;[27] (5) a notice to discontinue labor law violations issued by the Labor Commissioner to plaintiff Southern Counties Express, Inc. on February 24, 2012;[28] (6) two notices of hearing issued by the Labor Commissioner regarding claims filed against plaintiff Total

---

[22]*Id.*, ¶ 18.

[23]Request for Judicial Notice in Opposition to Defendants' Motions to Dismiss ("RJN"), Docket No. 24-1 Mar. 18, 2013).

[24]*Id.*, Exh. 1.

[25]*Id.*, Exh. 2.

[26]*Id.*, Exh. 3.

[27]*Id.*, Exh. 4.

[28]*Id.*, Exh. 5.

Transportation, Inc., dated May 10, 2012;[29] (7)  the San Diego Superior Court's ruling in *Vector Resources, Inc. v. Christine Baker*, Case No. 37-2012-00097974-CU-MC-CTL, issued May 10, 2012;[30] and (8) a BNA Daily Labor Report article titled "Court Preliminarily Approves Settlement, Permitting $9.625 Million Class Action Award," dated February 19, 2013.[31]

In ruling on a motion to dismiss, the court can consider material that is subject to judicial notice under Rule 201 of the Federal Rules of Evidence. *Maciel v. Rice*, No. CV-F-07-1231-LJO-DLB, 2007 WL 4525143, *2 (E.D. Cal. Dec. 18, 2007).  A judicially noticed fact must be one "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  FED.R.EVID. 201(b).

"Judicial notice is appropriate for records and 'reports of administrative bodies.'" *United States v. 14.02 Acres of Land More or Less in Fresno County*, 547 F.3d 943, 955 (9th Cir. 2008) (quoting *Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1954)).  The first six exhibits attached to plaintiffs' request for judicial notice are records of the EDD and the Office of the Labor Commissioner.  Defendants do not oppose plaintiffs' request for judicial notice of these documents or dispute their authenticity.  The court can therefore take judicial notice of the first six exhibits as public records of administrative bodies.  See *Tech. & Intellectual Prop. Strategies Grp. PC v. Fthenakis*, No. C 11–2373 MEJ, 2011 WL 351690, *7 n. 2 (N.D. Cal. Aug. 10, 2011) (taking judicial notice of a notice of claim and conference issued by the Labor Commissioner); *Brown v. Wireless Networks, Inc.*, No. C 07-4301(EDL), 2007 WL 3105069, *2 (N.D. Cal. Oct. 23, 2007) (taking judicial notice of claims filed with the Labor Commissioner because "the court may take judicial notice of matters of public record outside the pleadings"); *Krzesniak v. Cendant Corp.*, No. C 05-05156 MEJ, 2007 WL 640594, *2 (N.D. Cal. Feb. 27, 2007) (taking judicial notice of notices of hearing in California Labor Commissioner

---

[29]*Id.*, Exh. 6.

[30]*Id.*, Exh. 7.

[31]*Id.*, Exh. 8.

cases).

The court can also take judicial notice of the Superior Court's ruling in *Vector Resources*, because the order is a public record. See, e.g., *Morrison v. Peterson*, No. C 11–1896 LHK, 2013 WL 942723, *1 n. 1 (N.D. Cal. Mar. 11, 2013) ("A court may take judicial notice of court filings and other matters of public record," citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006)). The court therefore takes judicial notice of the existence of the *Vector Resources* opinion; it will not take judicial notice of the facts recited therein, however. *Id.*; see also *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (a court may take judicial notice of another court's opinion, not for the truth of the facts recited therein, but for the existence of the opinion); *Wallis v. Centennial Ins. Co., Inc.*, _ F.Supp.2d _, 2013 WL 772246, *3 (E.D. Cal. Feb. 28, 2013) ("The court will take judicial notice of these exhibits with the caveat that '[w]hile the authenticity and existence of a particular order, motion, pleading or judicial proceeding, which is a matter of public record, is judicially noticeable, veracity and validity of its contents (the underlying arguments made by the parties, disputed facts, and conclusions of applicable facts or law) are not,'" citing *United States v. S. Cal. Edison Co.*, 300 F.Supp.2d 964, 974 (E.D. Cal. 2004)).

The court cannot take judicial notice of plaintiffs' eighth exhibit, the BNA Daily Report Article, however. The facts contained in the article are not "generally known within the territorial jurisdiction of the trial court." While some of the facts in the article might be "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," i.e., the court records referenced in the article, plaintiffs have neither submitted those records nor cited them. The court therefore declines to take judicial notice of the article. See *Johnson v. Mitchell*, No. 2:10–cv–1968 GEB GGH, 2013 WL 595218, *2 (E.D. Cal. Feb. 15, 2013) ("As to the . . . documents, none of them are the proper subject of judicial notice. They are not public records, nor do they contain facts which are not subject to reasonable dispute. The source of the first document cannot be verified as it appears to simply be a website printout. The second document, which appears to be an online news article from the Sacramento Business Journal, is merely journalistic reporting"); *Jackson v. City and Cnty. of San Francisco*, No. C 09–2143, 2012

WL 3580525, *3 n. 3 (N.D. Cal. Aug. 17, 2012) ("Plaintiffs' . . . exhibits consist of magazine and newspaper articles. . . .  Judicial notice of such materials, offered to prove the truth of the matters asserted therein, is improper, and is denied on that basis"); *Brockington v. J.P. Morgan Chase Bank, N.A.*, No. C-08-05795 RMW, 2009 WL 1916690, *7 (N.D. Cal. July 1, 2009) (" In connection with her opposition papers, plaintiff submitted a request for judicial notice asking the court to take judicial notice of . . .  an article regarding a settlement of the Illinois lawsuit. . . . The request is denied.  Judicial notice of the . . . settlement does not appear to be proper under Rule 201(b) of the Federal Rules of Evidence").

## II.  DISCUSSION

### A.    Legal Standard Governing Rule 12(b)(1) Motions to Dismiss

A Rule 12(b)(1) motion tests whether the court has subject matter jurisdiction to hear the claims alleged in the complaint.  Such a motion may be "facial" or "factual."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  Stated differently, a party mounting a Rule 12(b)(1) challenge to the court's jurisdiction may do so either on the face of the pleadings or by presenting extrinsic evidence for the court's consideration.  See *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000); *Thornhill Publ'g Co. v. Gen. Tel. & Elecs.*, 594 F.2d 730, 733 (9th Cir. 1979).

As a general matter, "[i]n a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.  By contrast, in a factual attack, the challenger disputes the truth of . . . allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Safe Air for Everyone*, 373 F.3d at 1039.  Even when deciding a facial attack, however, a court can look beyond the complaint to consider documents that are proper subjects of judicial notice.  See *Maciel*, 2007 WL 4525143 at *2 ("In a facial attack, subject matter jurisdiction is challenged solely on the basis of the allegations contained in the complaint (along with any undisputed facts in the record or of which the court can take judicial notice)").  Whatever the nature of the challenge, the party seeking to sue in federal court bears the burden of burden of establishing that the court has subject matter jurisdiction to hear the

1 action. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Association of American*

2 *Medical Colleges v. United States*, 217 F.3d 770, 778-79 (9th Cir. 2000); *Stock West, Inc. v.*

3 *Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989).

4      Here, defendants attack the complaint on its face. The court therefore accepts plaintiffs'

5 allegations as true and examines whether they show that the court has subject matter jurisdiction

6 to hear the case. See *Valdez v. United States*, 837 F.Supp. 1065, 1067 (E.D. Cal. 1993), *aff'd.*,

7 56 F.3d 1177 (9th Cir. 1995).

8            **B.      Legal Standard Governing Ripeness and Standing**

9      Both defendants argue that the court lacks subject matter jurisdiction because the action

10 does not present a "case or controversy."  They argue that plaintiffs' claims are not ripe for

11 adjudication, and that plaintiffs have suffered no "injury in fact" sufficient to establish standing.

12      Under Article III, section 2 of the United States Constitution, federal courts have

13 jurisdiction to adjudicate only actual "Cases" or "Controversies." U.S. CONST., art. III, § 2, cl.

14 1; see also *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) ("It goes without saying that

15 those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold

16 requirement imposed by Article III of the Constitution by alleging an actual case or controversy");

17 *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) ("Our role is

18 neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live

19 cases or controversies consistent with the powers granted the judiciary in Article III of the

20 Constitution"); *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 989 (9th Cir. 1999) ("The twin

21 pillars of standing and 'case or controversy' go to the heart of Article III jurisdiction.  The

22 corollary to these principles is that federal courts have no jurisdiction to hear a case . . . where

23 no actual or live controversy exists").

24      Article III's case or controversy limitation requires those who invoke the power of a federal

25 court to demonstrate standing.  "[T]o satisfy Article III's standing requirements, a plaintiff must

26 show (1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual

27 or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged

28 action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will

1  be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental*

2  *Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  Where a plaintiff seeks declaratory and

3  injunctive relief, there is a further requirement – he must show a significant possibility of future

4  harm.  It is insufficient merely to demonstrate past injury.  See *San Diego County Gun Rights*

5  *Committee v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996).

6       The party invoking federal jurisdiction bears the burden of establishing each of these

7  elements of standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  In *Lujan*, the

8  Supreme Court explained that a plaintiff's burden to establish standing depends on the stage of the

9  litigation at which the issue is raised:

10       "Since they are not mere pleading requirements but rather an indispensable part of

11       the plaintiff's case, each element must be supported in the same way as any other

12       matter on which the plaintiff bears the burden of proof, i.e., with the manner and

13       degree of evidence required at the successive stages of the litigation.  At the

14       pleading stage, general factual allegations of injury resulting from the defendant's

15       conduct may suffice, for on a motion to dismiss we 'presum[e] that general

16       allegations embrace those specific facts that are necessary to support the claim.'"

17       *Id.* at 561 (internal citations omitted).

18       Like the standing doctrine, the doctrine of ripeness requires the court "to consider whether

19  the plaintiffs face a realistic danger of sustaining a direct injury . . . or, by contrast, if the alleged

20  injury is too 'imaginary' or 'speculative' to support jurisdiction."  *City of Auburn v. Qwest*

21  *Communication*, 260 F.3d 1160, 1171 (9th Cir. 2001); see also *Portman v. Cnty. of Santa Clara*,

22  995 F.2d 898, 902 (9th Cir. 1993) (ripeness "focuses on whether there is sufficient injury, and

23  thus is closely tied to the standing requirement").  "The ripeness doctrine seeks to separate matters

24  that are premature for review because the injury is speculative and may never occur from those

25  cases that are appropriate for federal court action."  *Id.* (quoting E. Chemerinsky, FEDERAL

26  JURISDICTION 99 (1989) (in turn citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967),

27  overruled on other grounds, *Califano v. Sanders*, 430 U.S. 99 (1977)).  "The 'basic rationale' of

28  the ripeness requirement is 'to prevent the courts, through avoidance of premature adjudication,

from entangling themselves in abstract disagreements.'" *Id.* (citing *Abbott Laboratories*, 387 U.S. at 148).

As the Supreme Court and the Ninth Circuit have observed, the ripeness requirement "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000); see also *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 734 n. 7 (1997). "If a case is not ripe for review, then there is no case or controversy, and the court lacks subject-matter jurisdiction." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005).

In *Thomas*, the Ninth Circuit observed that "[t]he constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong. Sorting out where standing ends and ripeness begins is not an easy task. Indeed, because the focus of [the] ripeness inquiry is primarily temporal in scope, ripeness can be characterized as standing on a timeline." *Thomas*, 220 F.3d at 1138. Because the constitutional component of the ripeness inquiry "merges almost completely" with the question of standing insofar as both focus on whether there is sufficient injury to establish a "case or controversy" under Article III, the court addresses whether plaintiffs have standing and whether their claims are ripe for adjudication in combination. See *id.* at 1139 ("Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented are "definite and concrete, not hypothetical or abstract.' . . . We need not delve into the nuances of the distinction between the injury in fact prong of standing and the constitutional component of ripeness: in this case, the analysis is the same," citing *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)).

Plaintiffs do not allege that they have already been injured by defendants. They contend, however, that they have adequately alleged the existence of a "case or controversy" because their complaint pleads facts showing that injury resulting from defendants' enforcement of the laws and policies they challenge is "impending." In *Thomas*, the Ninth Circuit outlined three factors to

1   consider in determining whether a claimed threat of future enforcement is genuine: "whether the

2   plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting

3   authorities have communicated a specific warning or threat to initiate proceedings, and the history

4   of past prosecution or enforcement under the challenged statute." *Thomas*, 220 F.3d at 1139.

5   The court employs these factors in assessing whether each of plaintiffs' claims constitutes a "case

6   or controversy" that is ripe for adjudication.

7           **C.      Whether the Court Has Jurisdiction to Hear Plaintiffs' First Claim For Relief**

8           Plaintiffs' first claim for relief seeks a declaration that CTC and its members are exempt,

9   under 49 U.S.C. § 14302(f), from application of defendants' alleged "unwritten policy" treating

10  independent motor carrier contractors as employees instead of independent contractors.  Plaintiffs

11  assert that the application of this policy will prevent them from implementing the pooling

12  arrangement approved by the STB.[32]

13          Because, as noted, defendants mount a facial attack on subject matter jurisdiction, the court

14  assumes the alleged policy exists, and concludes that plaintiffs have adequately pled a "concrete

15  plan" to violate it.  They allege that they do not treat the independent motor carrier contractors

16  as employees.   Specifically, they assert that they disclaim responsibility for the contractors'

17  business expenses, including maintenance, repairs, parking, and fuel expenses.[33] They also allege

18  that they compensate the contractors for freight hauling by paying negotiated rates rather than

19  wages.[34] Similarly, plaintiffs assert that they do not treat the contractors as employees for payroll

20  tax and withholding purposes.[35]

21          Plaintiffs do not, however, allege that defendants have specifically threatened to enforce

22  the "unwritten policy" against them by requiring them to treat the independent motor carrier

23

24  _____

25      [32]Complaint, ¶ 15.

26      [33]*Id.*, ¶ 7.

27      [34]*Id.*

28      [35]*Id.*

12

contractors as employees.  Nor do they allege that defendants have threatened to enforce any state laws against them based on application of the "unwritten policy."  They do not even allege that defendants have applied the "unwritten policy" to determine finally that the independent motor carrier contractors are employees.  Finally, plaintiffs plead no specific threats communicated by defendants that they will imminently make such a finding as a result of the "unwritten policy." Although plaintiffs allege that defendants have initiated investigations to determine whether the independent motor carrier contractors are statutory employees, they plead no facts linking the investigations to the "unwritten policy" challenged in the first claim for relief.  Indeed, plaintiffs' allegations suggest that application of the "unwritten policy" would obviate the need for any investigation or audit; they allege that pursuant to the policy, independent motor carrier contractors that have traditionally hauled freight under a contract with a CTC member are "*automatically* considered employees of the carriers."[36]

For the same reasons, the documents plaintiffs have proffered with their request for judicial notice do not constitute "specific threats" by defendants to enforce the "unwritten policy."  The judicially noticeable documents indicate that the EDD issued a "notice of assessment" against plaintiff Pacific 9 Transportation Co. on July 31, 2012.  They also indicate that the Labor Commissioner issued a notice to discontinue labor law violations to plaintiff Southern Counties Express, Inc. on February 24, 2012, and a records subpoena to plaintiff Overseas Freight, Inc. on May 1, 2012.  Nothing on the face of the documents, however, indicates that they reflect threats to enforce the "unwritten policy" that is alleged.  Plaintiffs plead no facts connecting the notices and subpoena to defendants' "unwritten policy."  Furthermore, the notices and subpoena are nearly a year old.  Plaintiffs have neither alleged nor adduced judicially noticeable proof that defendants acted on the notices or subpoena by issuing citations or commencing enforcement proceedings against them.  Consequently, even if the court were to assume without basis that the notices and subpoena were related to the "unwritten policy," the documents would not constitute threats of "impending" injury given that it appears they have not led to any injury, threat of

---

[36]*Id.*, ¶ 15 (emphasis added).

1    enforcement or enforcement action for approximately a year.

2         Plaintiffs do, however, allege a history of enforcement of the "unwritten policy." They

3    assert that the policy "has been applied uniformly in the past to other carriers which have

4    contracted independent motor carrier contractors to haul freight to the Ports."[37]  Plaintiffs allege

5    no facts describing defendants' application of the policy to the other carriers, however, and the

6    court cannot discern whether the circumstances under which defendants purportedly applied the

7    "unwritten policy" in the past are present in this case.  As a result, the allegations concerning past

8    enforcement against other carriers do not show that defendants' enforcement of the policy against

9    plaintiffs is imminent.

10        Given the vague and conclusory nature of plaintiffs' allegations concerning past

11   enforcement of the "unwritten policy" against other carriers, and absent facts indicating that

12   defendants have communicated a specific threat to enforce the policy against plaintiffs, the court

13   concludes that the first claim for relief is not ripe for review.  Similarly, it finds that plaintiffs

14   have failed to show that they have standing to assert the relief, because they do not allege facts

15   demonstrating that injury resulting from defendants' future enforcement of the "unwritten policy"

16   is "certainly impending" rather than "conjectural or hypothetical."  See *Clapper v. Amnesty Int'l

17   USA*, 133 S.Ct. 1138, 1143 (2013).

18        **D.    Whether the Court Has Jurisdiction to Hear Plaintiffs' Second Claim for Relief**

19        Plaintiffs' second claim for relief seeks an injunction prohibiting the Labor Commissioner

20   and the EDD from investigating, processing, or proceeding to hearing on any claim against CTC

21   members that asserts the independent motor carrier contractors should be treated as employees.

22   Plaintiffs allege that the CTC and its members will suffer irreparable injury if injunctive relief is

23   not granted, because they will "not be able to continue to utilize independent motor carrier

24   contractors for port drayage purposes, and to share independent motor carrier contractors, leased

25   equipment, and other services as their business needs dictate[ ] if [d]efendants are permitted to

26

27   _____

28   [37]*Id.*

14

categorize . . . the independent motor carrier contractors as 'employees.'"[38]  Plaintiffs allege they will suffer this injury as a result of defendants' "enforcement policies," which constitute "state laws."[39]  Plaintiffs do not describe the "enforcement policies" they reference in any further detail. It is therefore unclear what policies plaintiffs seek to enjoin or how those policies relate to defendants' investigations of CTC members.

Su construes plaintiffs' second claim for relief as a request that the court enjoin the enforcement of the "unwritten policy" challenged in the first claim for relief.  If that is the case, plaintiffs' second claim fails to raise an actual "case or controversy" for reasons already discussed.  To the extent the second claim for relief is directed toward defendants' "unwritten policy," therefore, the court concludes that the claim is not ripe for review, and that plaintiffs lack standing to assert it.

Liberally construed, however, the second claim for relief can be read as a challenge to defendants' investigations and audits.  The claim can also be construed as a challenge to the Labor Commissioner's policy of processing claims filed by independent contractors against CTC members.  Construed in either way, plaintiffs' claim is not ripe.  In considering whether a case is ripe for review, a court must evaluate "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Winter v. Cal. Med. Rev., Inc.*, 900 F.2d 1322, 1325 (9th Cir. 1990) (quoting *Abbott Laboratories*, 387 U.S. at 149).  "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, *and the challenged action is final*."  *Id.* (citing *Standard Alaska Prod. Co. v. Schaible*, 874 F.2d 624, 627 (9th Cir. 1989) (emphasis added).  "In interpreting the finality requirement, a court 'looks to whether the [challenged] action represents the final administrative word[.]'"  *Id.* (quoting State *of Cal., Dep't of Educ. v. Bennett*, 833 F.2d 827, 833 (9th Cir. 1987)).  Plaintiffs do not allege that defendants' investigations, audits, or claims-processing activities have resoluted in a final determination that CTC's contractors are employees.  Nor do they allege that defendants have

---

[38]*Id.*, ¶ 23.

[39]*Id.*, ¶ 21.

finally decided that CTC members have violated state law by failing to treat the contractors as employees.

In *Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 781 (9th Cir. 2000), the Ninth Circuit held that Medicare reimbursement audits conducted by the Office of Inspector General ("OIG") did not give rise to a case or controversy under Article III because the audits were not final.   The court stated:

> "Even if we were to assume that OIG has taken a definitive position on the nature and scope of the . . . audits[,] . . . the audits themselves do not 'impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process.' An investigation, even one conducted with an eye to enforcement, is quintessentially non-final as a form of agency action. More importantly, on the facts before this court it is an open question whether the . . . audits will actually result in findings of abuse or fraud." *Id.* at 780-81 (citing *Jobs, Training & Services, Inc. v. East Tex. Council*, 50 F.3d 1318, 1324-25 (5th Cir.1995) ( "'[A]n agency's initiation of an investigation does not constitute final agency action.' . . . Judicial intervention at [the investigative] stage will deter rather than foster effective administration of the statute," quoting *Veldhoen v. United States Coast Guard*, 35 F.3d 222, 225 (5th Cir.1994)).

See also *Winter*, 900 F.2d at 1325-26 (since the agency's conclusions could change with additional information, "[a]ppellant's claim that the investigation itself represented final agency action lacks merit. . . .   This court must give the agency an opportunity to formulate a final position"); *O'Brien, Inc. v. Sec. & Exch. Comm'n*, 704 F.2d 1065, 1067 n. 6 (9th Cir. 1983) ("District court review of the propriety of SEC actions in its investigation would . . . have been inappropriate because 'final agency action,' a prerequisite to judicial review, had not yet occurred," citing *Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232 (1980)), rev'd on other grounds, 467 U.S. 735 (1984); *Dresser Indus., Inc. v. United States*, 596 F.2d 1231, 1235 (5th Cir. 1979) (holding that an SEC and DOJ investigations were not final agency action)).

The Ninth Circuit applied a similar ripeness analysis in *Manufactured Home Communities*

16

*Inc. v. City of San Jose*, 420 F.3d 1022, 1033 (9th Cir. 2005).  There, a landlord filed due process claims challenging a letter opinion prepared by the city attorney.  The opinion stated that plaintiff did not qualify for a statutory exemption to the city's rent control ordinance.  The circuit court held that plaintiff's claims were not ripe for review, because the letter was not a final administrative decision, and because plaintiff had not yet pursued relief through the city's administrative process.  It reasoned:

> "The Supreme Court has explained that the ripeness doctrine's 'basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' Premature adjudication is exactly the problem plaguing [plaintiff's] due process claim: [plaintiff] never engaged in the administrative process. [Plaintiff] never filed a petition to raise the . . . rents.  No final administrative decision exists for [plaintiff's] claims related to the . . . exemption.  If [plaintiff] files a[n] [administrative] petition, then the hearing officer may or may not grant the rent increase.  Until [plaintiff] files the petition, there is no way of knowing whether a real case or controversy exists." *Id.* (quoting *Abbot Laboratories*, 387 U.S. at 148-49).

Here, as in *Ass'n of Am. Med Colleges*, plaintiffs do not allege that defendants' investigations, audits, and claims processing have imposed obligations on them, denied them rights, or fixed legal relationships.   Like the plaintiff in *Manufactured Home Communities*, plaintiffs have not yet availed themselves of the administrative processes available to them (such as the Labor Commissioner's claims adjudication process) to challenge a final decision by defendants.  They have not alleged that a final administrative decision exists for them to challenge.  In the absence of a final decision, plaintiffs' second claim for relief is not ripe for adjudication.  Moreover, because plaintiffs have not demonstrated actual or imminent injury resulting from defendants' investigations and audits, or from the Labor Commissioner's processing of

contractors' claims, they lack standing to seek injunctive relief.

       **E.**    **Whether the Court Has Jurisdiction to Hear Plaintiffs' Third Claim for Relief**

      Plaintiffs' third claim for relief seeks a declaration that California Labor Code §§ 226.7 and 512 are preempted by the FAAAA because they directly affect CTC's prices, routes, and services.  Section 225.6 provides that "[n]o employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission." CAL. LAB. CODE § 226.7(a).  It also provides that an employer who fails to provide an employee a meal period or rest break in accordance with an order of the Industrial Welfare Commission must pay the employee an additional hour of pay at the employee's regular rate of compensation. *Id.*, § 226.7 (b).  Section 512 provides:

>  "An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee.  An employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived." *Id.*, § 512(a).

      Plaintiffs do not allege that they have a "concrete plan" to violate California's meal and rest break laws.  They allege that the drivers that operate their trucks are independent contractors.[40]  If so, the meal and rest period provisions of California law do not apply to the contractors.  See, e.g., *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010) ("The Drivers' claims involve entitlement to benefits under the California Labor Code.  Whether the Drivers are entitled to those benefits depends on whether they are employees").  Plaintiffs have not alleged

---

[40]*Id.*, ¶ 7.

a "concrete plan" to convert their relationships with their contractors into an employer-employee relationship subject to the challenged laws.   Even if the meal and rest break laws plaintiffs challenge applied to the independent motor carrier contractors, moreover, plaintiffs have not alleged a "concrete plan" to deny the contractors the meal and rest breaks to which they would be entitled under the California Labor Code.   Indeed, they have not even alleged an intent to do so.[41]

Plaintiffs also do not allege that defendants have specifically threatened to enforce California's meal and rest break laws against them.   At most, they plead that defendants have initiated investigations to determine whether the independent motor carrier contractors are statutory employees.   As noted, they do not assert that defendants finally determined that the contractors are in fact employees.   While a finding that the contractors are employees could expose plaintiffs to future enforcement of the meal and rest break laws, they do not allege that defendants have taken any action to enforce those laws against them.   See *Thomas*, 220 F.3d at 1140 (case or controversy requirement was not met, where "[n]o action ha[d] ever been brought . . . to enforce the [challenged] provision").

Finally, plaintiffs fail to allege that historically defendants have enforced California's meal and rest break laws against companies using the services of independent motor carrier contractors. They do not plead that defendants have subjected them to fines or made findings that they are liable under those laws.   Nor do they allege facts demonstrating that defendants have enforced California's meal and rest break laws against other entities contracting with independent motor carrier contractors.

All three *Thomas* factors, therefore, indicate that plaintiff's third claim for relief is not a "case or controversy," as required by Article III.   Consequently, the court concludes that plaintiffs' third claim for relief is not ripe for adjudication.   For the same reason, plaintiffs lack

_____

[41]Plaintiffs do not allege that they exert any control over the contractors' meal and rest breaks.   They assert that the contractors are paid negotiated rates instead of wages.   (*Id.*, ¶ 7.   It is unclear, therefore, how plaintiffs could enact a "concrete plan" to violate § 226.7 or § 512 according to the allegations in their complaint.

1  standing to pursue a declaration that California's meal and rest period laws are preempted by the

2  FAAAA.[42]

3     **F.    Whether the Court Has Jurisdiction to Hear Plaintiffs' Declaratory and**

4        **Injunctive Relief Claims**

5        Plaintiffs seek to enjoin the Labor Commissioner and the EDD from "investigating,

6  processing, or proceeding to hearing on any claim against the CTC members, including but not

7  limited to Plaintiff Motor Carriers, based on the contention that the independent motor carrier

8  contractors of leased vehicles contracted by CTC members to haul drayage to the Ports of Long

9  Beach and Los Angeles . . . be treated as employees instead of independent contractors[.]"[43]

10  Plaintiffs also seek a declaration that they are exempt from "state laws," policies, and practices

11  that require them to treat the independent motor carrier contractors as employees.[44]  Harris argues

12  that the Tax Injunction Act ("TIA") bars the court from exercising subject matter jurisdiction over

13  plaintiffs' declaratory and injunctive relief claims against the EDD.[45]  She contends that granting

14  the relief plaintiffs seek concerning their possible tax obligations would violate the TIA.[46]

15        The TIA provides that "district courts shall not enjoin, suspend or restrain the assessment,

16  levy or collection of any tax under State law where a plain, speedy and efficient remedy may be

17  had in the courts of such State." 29 U.S.C. § 1341.   The Supreme Court and the Ninth Circuit

18  have both held that California courts offer a "plain, speedy and efficient remedy" for tax relief.

19  *Franchise Tax Bd. v. Alcan Aluminium*, 493 U.S. 331, 338 (1990); *Jerron West, Inc. v. State of*

20  *California State Bd. of Equalization*, 129 F.3d 1334, 1339 (9th Cir. 1997).   Consequently, the

21  TIA precludes the court from enjoining defendants' collection of any tax under California law.

22

23     [42]Because the court concludes that it lacks subject matter jurisdiction to hear any of

24  plaintiffs' claims, it does not address the parties' arguments concerning the merits of the claims.

25     [43]Complaint at 20; see also *id.*, ¶ 1.

26     [44]*Id.* at 19; see also *id.* ¶ 1.

27     [45]Harris MTD at 14.

28     [46]*Id.*

The Supreme Court has recognized that the TIA is "grounded in the need of States to administer their fiscal affairs without undue interference from federal courts." *Arkansas v. Farm Farm Credit Services*, 520 U.S. 821, 832 (1997). It has also stated that "federal courts must guard against interpretations of the . . . Act which might defeat its purpose and its text." *Id.* at 827; see also *Jerron West, Inc.*, 129 F.3d at 1337 ("[E]ven an indirect restraint on tax assessment would violate the Act"). The Court has observed, moreover, that the purpose of the TIA is "to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982); see also *Rosewell v. LaSalle National Bank*, 450 U.S. 503, 522 (1981) (same). Accordingly, it has held that the TIA applies to more than injunctive relief claims; it also precludes district courts from granting declaratory judgments that may interfere with the assessment, levy, or collection of taxes under state law. *National Private Truck Council, Inc. v. Oklahoma Tax Commission*, 515 U.S. 582, 586 (1995); *Grace Brethren Church*, 457 U.S. at 408. The TIA thus bars the court from granting declaratory relief that would impose "even an indirect restraint on tax assessment" under California law. *Jerron West, Inc.*, 129 F.3d at 1337.

Plaintiffs argue that the TIA does not bar the CTC's declaratory and injunctive relief claims because it is not a taxpayer challenging the assessment and collection of taxes against it.[47] They note that they do not allege that the CTC is the target of defendants' assessment and/or collection of payroll taxes – only its members are. Citing *Hibbs v. Winn,* 542 U.S. 88 (2004), and *Capitol Industries-EMI v. Bennett*, 681 F.2d 1107, 1119 (9th Cir. 1982), plaintiffs assert that the TIA does not bar the CTC's claims because it is a non-taxpayer.

In *Hibbs*, the Supreme Court held that the TIA did not bar an action brought by Arizona taxpayers that challenged a state statute giving taxpayers tax credits for contributions they made to non-profit organizations that awarded educational scholarships and tuition grants to children attending parochial schools. *Hibbs*, 542 U.S. at 92-93. The taxpayers sought an injunction against the tax credits, a declaration that the statute violated the Establishment Clause, and an

---

[47]Opp. at 14-16.

order directing the non-profit organizations to pay all contributions in their possession into the state general fund. *Id.* at 96. The *Hibbs* Court noted that it had "interpreted and applied the TIA only in cases Congress wrote the Act to address, *i.e.* cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes." *Id.* at 107. It noted that the remedy "was not one designed for the universe of plaintiffs who sue the State. Rather, it was a remedy tailormade for taxpayers." *Id.* Citing *Hibbs*, plaintiffs argue that the TIA does not bar the CTC's claims because it is not a "state taxpayer[ ] seek[ing] federal-court orders enabling [it] to avoid paying state taxes."[48]

   *Hibbs*, however, did not specifically address whether the TIA permits a non-taxpaying entity that consists of taxpayer members to seek injunctive or declaratory relief that would allow those members to avoid the payment of state taxes. The Court had no occasion to address the issue because the plaintiffs there were taxpayers. The *Hibbs* Court's conclusion that the TIA did not bar plaintiffs' action turned on the fact that they challenged *tax benefits* obtained by other taxpayers rather than tax "assessment, levy, and collection" directed toward them. *Id.* at 105 n. 7. Stated differently, the Court's decision turned on the fact that plaintiffs did not seek an injunction or a declaration that would "interfere with state tax collection." *Id.* at 104-110. Here, the CTC seeks injunctive and declaratory relief that will enable its members to "avoid payment of taxes or to otherwise interfere with state tax collection."[49] *Hibbs* does not, therefore, clearly demonstrate that the CTC's claims are not barred by the TIA.

   The Ninth Circuit has considered whether "a nontaxpayer, without state administrative or judicial remedies, is precluded under [the TIA] from maintaining an action in federal court

---

[48]Opp. at 15.

[49]Plaintiffs contend that the TIA "does not prohibit lawsuits that merely interfere with the operation of . . . state tax laws." (*Id.*) The relief the CTC seeks, however, does not "merely interfere with the operation of, or compliance with," state tax laws. Rather, it specifically seeks relief pertaining to "those aspects of state tax regimes that are needed to produce revenue – i.e., assessment, levy, and collection." *Hibbs*, 542 U.S. at 105 n. 7. As interpreted by the Ninth Circuit, the TIA bars the granting of relief that would impose "even an indirect restraint on tax assessment" by California officials. *Jerron West, Inc.*, 129 F.3d at 1337.

because it has substantially similar interests and claims as a taxpayer that has such state remedies."
681 F.2d at 1119.  In *Bennett*, the court of appeals held that the parent company of a subsidiary
taxpayer could sue for injunctive and declaratory relief to prevent state officials from assessing
taxes against its subsidiary.  *Id.*  The court's conclusion that the TIA did not bar the parent
company's claims was not, however, based on the fact that it was a nontaxpayer.  Rather, its
holding turned on the fact that the plaintiff did not have a "plain, speedy and efficient remedy"
in California courts.  *Id.* ("Because California does not provide EMI with an effective state
remedy for its claims, Section 1341 does not bar the district court from exercising subject matter
jurisdiction over such claims"); see also *id.* ("A nontaxpayer that has stated a claim with respect
to an assessment or collection is entitled to a judicial remedy in which [it] can participate as a
party").[50]  *Bennett*, therefore, does not support plaintiffs' claim that the CTC's claims are not
barred by TIA simply because it is a nontaxpayer.

Plaintiffs do not argue that the CTC lacks an effective state remedy for its claims, and
Harris affirmatively asserts that the CTC *does* have a "plain, speedy, and efficient" state remedy
for it claims.[51]  The burden is on plaintiffs to establish that the court has jurisdiction to hear their
claims.  See *Lowe v. Washoe Cnty.*, No. 3:08–CV–00217–KJD, 2009 WL 801829, *2 (D. Nev.
Mar. 24, 2009) ("Defendants' Motion to Dismiss presents a factual challenge disclaiming subject
matter jurisdiction pursuant to Tax Injunction Act.  Therefore, there is no presumption of
truthfulness of the Plaintiffs' allegation, and the burden is on the Plaintiffs to establish this Court's
jurisdiction," citing *Jacobson v. ex rel. U.S. Postal Service*, 276 F.Supp.2d 1106, 1108 (D. Nev.
2003)); *Lavis v. Bayless*, 233 F.Supp.2d 1217, 1219 (D. Ariz. 2001) ("The plaintiffs have the

---

[50]The *Bennett* court noted that the California courts did not, at that time, provide a
sufficient state court adjudicative process for parent companies that wished to challenge tax
assessments against their subsidiaries, necessitating federal adjudication of the issue.  681 F.2d
at 1119 n. 32.

[51]Harris Reply at 7.  Harris notes that CTC is comprised of, owned by, and controlled by
its members, each of which has "plain, speedy, and efficient" remedies in California; she thus
implies that CTC can obtain an effective remedy in state court by having its members file direct
claims.  (*Id.*)

1   burden to establish subject matter jurisdiction.  In this case subject matter jurisdiction turns on the

2   application of the Tax Injunction Act").  In this case, that requires a showing that the CTC lacks

3   adequate state remedies.  Because plaintiffs cite no authority and make no argument suggesting

4   that the CTC lacks adequate state court remedies, *Bennett* does not demonstrate that the court has

5   jurisdiction to hear the CTC's claims.

6         Plaintiffs next contend that the TIA does not bar the claims of CTC members because they

7   will suffer "irreparable injury" if the court does not grant the requested relief.[52]  In *National*

8   *Private Truck Council*, the Supreme Court recognized that "there may be extraordinary

9   circumstances under which injunctive or declaratory relief is available even when a legal remedy

10   exists."  515 U.S. 582, 591 n. 6.  By way of example, the Court stated, equity might be invoked

11   to justify injunctive and/or declaratory relief if "enforcement of the tax would . . . produce

12   irreparable injury."  *Id*.  Plaintiffs fail, however, to substantiate their claim that irreparable harm

13   will befall the CTC member plaintiffs if the court dismisses their claims.  For the reasons stated

14   in the court's discussion of the ripeness of plaintiffs' claims, *supra*, plaintiffs have not

15   demonstrated that they face actual or imminent injury as a result of defendants' alleged policies

16   and practices.  The passages of the complaint that plaintiffs cite to show "irreparable injury"

17   simply describe the nature of the pooling agreement among CTC's members.  Although plaintiffs

18   contend that EDD's actions are "frustrating" CTC's efforts to carry out the pooling agreement,[53]

19   their allegations do not demonstrate that they will suffer "irreparable injury" as a result of such

20   "frustration."  Presumably, the alleged "frustration" takes the form of lost monetary gains during

21   a particular time period; such frustration is not "irreparable."  See *Sampson v. Murray*, 415 U.S.

22   61, 90 (1974) ("The key word in this consideration is irreparable. Mere injuries, however

23   substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are

24   not enough.  The possibility that adequate compensatory or other corrective relief will be available

25   at a later date . . . weighs heavily against a claim of irreparable harm").  For this reason and

26

27   [52]Opp. at 16.

28   [53]*Id*. at 17 (citing Complaint, ¶¶ 15-16); see also Complaint, ¶ 14.

because they have not shown that they will be unable to redress injuries caused by the EDD's actions through remedies at the state level, plaintiffs have not demonstrated that an "irreparable injury" exception to the TIA applies here.

Finally, plaintiffs argue that the TIA does not apply to EDD's assessment of "penalties" because it does not apply to regulatory penalties. Plaintiffs assert that the EDD has assessed penalties of $233,051.24 against one of CTC's members.[54] The assessment attached to plaintiffs' Request for Judicial Notice specifies that $233,051.24 of the total $2,713,199.13, or approximately 8.5%, constitutes "1127 Assessment Penalties."[55] Plaintiffs contend the Assessment Penalties are not taxes because they are regulatory in nature. As a consequence, they argue, the TIA does not preclude the court from granting them injunctive or declaratory relief preventing the assessment of such penalties.[56] Harris does not dispute that the penalties are regulatory in nature; she simply asserts that penalties are only a small portion of the amount assessed by the EDD against the CTC Member that received the notice of assessment proffered by plaintiffs.[57]

Penalties — even those associated with the nonpayment of taxes — are not taxes because they are assessed "so that delinquent tax debtors will be deterred the next time around from ignoring their legal obligations." *RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indem. Co.*, 169 F.3d 448, 457 (7th Cir. 1999). "The incentive structure created by [such] penalties reveal[s] their regulatory character: Penalties are designed to incentivize compliance with law, not to raise revenue." *Chamber of Commerce of United States v. Edmondson*, 594 F.3d 742, 762 (10th Cir. 2010); see also *Abuzaid v. Woodward*, No. 1:08-CV-1213, 2010 WL 653307, *6 (N.D.N.Y. Feb. 19, 2010) ("The TIA . . . does not apply to the instant action, which involves

---

[54]Opp. at 18.

[55]RJN, Exh. 1.

[56]*Id.*

[57]Harris Reply at 7.

an assessment of a penalty, not a tax. The correctness of this characterization is evident by reference to the [notices of determination] provided by Defendant to Plaintiffs, which indicate that the assessments are penalties, not taxes. . . .  The words tax and penalties 'are not interchangeable one for the other.' . . .  The TIA, therefore, does not apply to the instant action," citing *United States v. LaFranca*, 282 U.S. 568, 572 (1931); *RTC Commercial*, 169 F.3d at 457–58 ("[A] penalty is not a tax for TIA purposes")). If plaintiffs' claims for injunctive and declaratory relief were specifically directed at the EDD's assessment of penalties, therefore, the court would not be precluded by the TIA from considering them.

The complaint, however, makes no mention of the EDD's assessment of penalties against the CTC or its members.  Plaintiffs' declaratory and injunctive relief prayers are broadly worded, requesting that the court exempt them from any "state laws," practices, or policies that would require them to treat the independent motor carrier contractors as employees.[58]  Their injunctive and declaratory relief claims, therefore, cannot be said to be limited to the assessment of penalties.  Consequently, the court concludes that it lacks jurisdiction under the TIA to consider plaintiffs' injunctive and declaratory relief claims as they are currently pleaded.

### III.  CONCLUSION

For the reasons stated, defendants' motions to dismiss are granted.  Plaintiffs' complaint is dismissed for lack of subject matter jurisdiction, with leave to amend.  See, e.g., *Sharnese v. California*, No. CV 10–6796–VAP (MAN), 2011 WL 7268432, *6 (C.D. Cal. Aug. 24, 2011) ("An action should not be dismissed for lack of subject matter jurisdiction without giving the plaintiff an opportunity to amend, unless it is clear that the jurisdictional deficiency cannot be cured by amendment," quoting *May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211, 1216

---

[58]Complaint at 19-21.

1  (9th Cir. 1980)).  Plaintiffs may file an amended complaint that addresses the deficiencies noted

2  herein within twenty days of the date of this order.

3

4  DATED: July 30, 2013

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE